[Crim. No. 331. In Bank.—February 24, 1898.]

THE PEOPLE, Respondent, v. BENJAMIN DICE, Appellant.

CRIMINAL LAW—HOMICIDE—SELF-DEFENSE—APPEAL—REVIEW OF EVIDENCE—CONFLICT AS TO FIRING OF FIRST SHOT.—A verdict of conviction of murder will not be set aside for insufficiency of the evidence to support it, notwithstanding a strong showing of self-defense on the part of the defendant, where the strain of the case comes upon the firing of the first shot, and there is conflicting evidence on that subject, and sufficient legal evidence appears to have justified the jury in finding that the defendant fired the fatal shot first, and that the shot of the deceased at the defendant followed afterward.

ID.—EVIDENCE—DISPUTE AS TO WATER—THREAT OF DEFENDANT—IMMATERIAL CONVERSATION.—Where the controversy which led to the homicide related to the use of water through a ditch, which was disputed between the defendant and the deceased, and which the deceased had refused to allow the defendant to take, evidence of a threat of the defendant that he would have the water or he would kill the deceased, is admissible; and the fact that much of the conversation in which the threat occurred relates to the water question, which the witness did not remember or could not detail in substance, is immaterial, where it is not made to appear that he did not give the substance of all the language used by the defendant in uttering the threat.

ID.—DECLARATION OF DEFENDANT AFTER HOMICIDE—FIRING OF FIRST SHOT—RES GESTÆ.—A declaration made by the defendant in his own interest, subsequent to the homicide, and after he had given himself up to the constable, to the effect that the deceased had fired the first shot before he (defendant) had fired, is no part of the res gestae, and is inadmissible.

ID.—IMMATERIAL EVIDENCE AT PRELIMINARY EXAMINATION—IMPROPER IMPEACHMENT.—Where a witness, upon cross-examination, testified that he could not remember how many cows he was milking upon the evening of the shooting, and admitted that his recollection was fresher on that subject at the preliminary examination, his evidence given at that examination, stating the number, is not admissible as impeaching or contradictory evidence, and is properly rejected as immaterial.

ID.—AGES OF CHILDREN OF DEFENDANT.—Evidence offered for the purpose of showing that the children of the defendant were of tender years, which could only be designed to move the jury to compassion, is properly excluded.

ID.—INSTRUCTION AS TO MALICE—CODE DEFINITIONS.—An instruction as to malice, giving the general definition of that word in the language of subdivision 4 of section 7 of the Penal Code, followed by a special definition of the same word as applied to the crime of murder in section 188 of the Penal Code, is not misleading, confusing, or injurious.

ID.—INSTRUCTION AS TO GRADES OF OFFENSE—PUNISHMENT—PROVINCE OF JURY—IMPROPRIETY FAVORABLE TO DEFENDANT.—In instructing the jury as to the degrees of murder, and as to manslaughter, it is proper to state to them their power and duty as to punishment, if they should render a verdict of guilty of murder in the first degree; but it is not commendable to instruct them as to the punishment provided by law upon conviction of a less grade of the offense, with the punishment of which the jurors have nothing to do; but the impropriety of such instruction has an influence upon the jury favorable to the defendant, and is not one of which the defendant may justly complain.

APPEAL from a judgment of the Superior Court of Tulare County and from an order denying a new trial. Wheaton A. Gray, Judge.

The facts are stated in the opinion of the court.

Bradley & Farnsworth, and Daggett & Adams, for Appellant.

W. F. Fitzgerald, Attorney General, and Charles H. Jackson, Deputy Attorney General, for Respondent.

HENSHAW, J.—The defendant, informed against for the murder of his brother in law, Grant Smith, was found guilty of murder in the second degree. From the judgment and from the order denying him a new trial he prosecutes his appeal.

The first contention of his counsel, and the one most strenuously urged upon the attention of this court, is that the verdict was contrary to the evidence, and that under the evidence it clearly appeared that the killing, which is admitted, was done in necessary defense of defendant's wife and of himself.

The salient features of the case are the following: Mrs. Dice owned a quarter section of land, and had used upon it for purposes of irrigation water taken from a ditch. Some years before the date of the tragedy the upper portion of this ditch had been abandoned. A new ditch had been constructed from the source of the water supply, which connected with the old ditch on or near the land of Mrs. Dice, the water from the point of connection flowing through the old ditch. Grant Smith had aided in the construction of the new ditch, and at the time of the homicide was living above the land of Mrs. Dice, the ditch passing through his land and about one hundred feet from the house where he resided with his wife. Mrs. Dice insisted that she was entitled of right to use the water from the new ditch. Her brother declared that she should have none of the water until he was paid two hundred and fifty dollars as compensation for his labor in constructing the ditch. There were other owners of the ditch and water rights. Mrs. Dice's right to the water from the new ditch was founded upon her claim that a water right from the old ditch was appurtenant to her land, and that the construction of the new ditch was but a change in the place of diversion. It is not made clear by the record whether this contention was or was not well founded, but its determination is immaterial to the questions here involved. It may be said, however, that the father of Mrs. Dice, a short time before the tragedy, sold "one-half of my interest in the Wood's Central ditch" to his daughter. The Wood's Central ditch, however, was the old ditch, and the father testified that in making this conveyance to his daughter he told her that he had no interest or title whatsoever in or to the new ditch. The land which Grant Smith occupied was contiguous to and immediately above the land of Mrs. Dice. Mrs. Dice's land was the last land supplied from the ditch. Her brother constructed dams in the ditch preventing the flow of water to her land. Some bitterness of feeling was shown to

exist between the parties. Luke Smith, a brother of the deceased, testifies that defendant had said that he would have the water or kill Grant Smith. Grant Smith had said to Dice that if he interfered with the dam he would put him, Dice, in the ditch and make a dam out of his body. Grant Smith was the physical superior of Dice, and on previous occasions had beaten him severely. It was a fact established by an abundance of uncontradicted evidence that Dice's reputation for peace and quiet was good. There was a sharp conflict in the evidence upon the reputation of the deceased as being overbearing and quarrelsome. The alfalfa and trees upon the Dice place were suffering for water.

Upon the morning of the tenth day of June, Dice rode up to the home of Scruggs, who was a stockholder in Wood's Central Irrigation Ditch Company, whose stockholders were using water from the new ditch, and met Mr. Scruggs with the declaration that he had come to get water. Dice was unknown to Scruggs, and the latter was apparently a disinterested witness. Scruggs informed him that he would finish using the water that day, but that it was understood that it was next to be turned upon the land of one Gilligan. Dice told Scruggs that he had arranged with Gilligan that the water should be turned down to him, and added: "I want the water for a short time to settle the trouble between me and Grant Smith." The defendant denies having made that or any such remark. Dice returned down the line of the ditch and removed three dams which had been thrown across it upon the land of Grant Smith. Later in the day and about sundown he found one of the dams, that immediately in front of the house of Grant Smith, had been replaced. Grant Smith had discovered the removal of the dams and had replaced one of them, and at the same time had fastened to a post a Winchester rifle, running a cord connected with the trigger across the dam, the arrangement being designed as a spring gun, whereby any interference with the dam would cause the discharge of the rifle. The rifle, however, was not set so as to cause injury, but was attached to the post with the muzzle directly downward and about six inches from the ground. It was thus designed to give an alarm in case of interference. Dice returned to his house, and after supper he and his wife

in a buggy drawn by a single horse drove to the Smith place. In the buggy they carried a shovel, and under the seat of the buggy Dice had placed a double-barreled shotgun, loaded either with small buckshot or very large bird shot. Dice testifies: "I told my wife the dams had been replaced, two of them, and we would go back and see if Grant would let us remove the dams out. I told her if he would not let us tear the dams out that I would go and bring suit then and settle the business." There was a light in Grant Smith's house when they drove up, but they did not approach the house nor have any conversation with its inmates. Instead they drove directly to the dam, stopped the horse, and Mrs. Dice descended from the buggy, took the shovel and began to remove the dam. It was at this time quite dark, but the night was clear, still and starlit. In the house were Mr. and Mrs. Smith. He had retired, and she was in night costume. Hearing the sound of the buggy, he arose from bed, dressed himself, and went down to the dam. Mrs. Smith put out the light the better to enable her to see, and sat looking out of the window which faced the dam and was about one hundred feet distant therefrom. By Mrs. Smith's account, as her husband left the house she told him to be careful and not get into any trouble, to which he replied, "Oh, there won't be any trouble." As he approached the dam he said, "good evening," and his sister, Mrs. Dice, responded with a like greeting. He then passed around the head of the horse and out of sight of his watching wife. She testifies that she could discern the figure of a man in the buggy, and by a peculiarity of his whistle, for he was whistling, recognized him as defendant Dice. There was some conversation, the words of which she could not distinguish, and then she saw the flash and heard the report of a gun. From her account it was fired by the occupant of the buggy: "It came from the buggy. I am positive that that shot came from the buggy. I mean by that that the person that fired that shot was sitting in the buggy at the time he fired it. I could see some one sitting in the buggy at the distance that I occupied from the buggy." The flash was in the direction which her husband had taken. After the report she heard her husband "holler 'Oh.' " She recognized it as his voice, and it was a sound of pain and distress. She testifies

further: "When that first shot was fired he did not groan or shout. He just hollered 'Oh, Oh,' the first 'Oh' louder than the rest, several times. Those exclamations did not continue until after the second shot that I heard. It was probably fifteen seconds after the first shot before I heard the second shot, almost immediately. My husband hollered; when the first shot was fired I started to get up. My husband hollered and I started to come, and I hollered myself. I got up and went out there. Before I went out there the second shot had gone off. When the second shot went off I was just raising up to get up. The interval between the two shots was so short that when I heard the first shot I started up to get up, and before I got completely up the other shot went off. I did not see the second shot when it went off. . . . . When I got outside I went in the same direction that my husband went when he went out. When I got outside Mrs. Dice was telling or hollering, 'Go on, papa; go on, papa.' Mr. Dice says, 'Get in here.' I don't know how many times he said it. She was telling him to go on, and he said, 'I aint afraid. I have got four shots left.' The horse kind of jumped around when that first shot was fired; that is, swung around to the left. When the horse jumped I don't remember of somebody hollering 'Whoa' to the horse, as though he was speaking to the horse. When that horse started no one hollered 'Whoa,' as though speaking to the horse at that time. No one at any time that evening while the transaction occurred spoke to the horse in that way, or to that horse that I remember of. . . . . When I got out there Mr. Dice was in the buggy or wagon. I could see Mrs. Dice. She was putting the shovel in the back end of the buggy when I first came out." The wife then entered the buggy with her husband and the two drove away.

Mrs. Smith further testified that her husband did not make any such exclamation as "Oh" after the second shot was fired. She heard no loud groans from her husband after the second shot. She found the body of her husband near the post to which the gun had been attached. It had fallen across a barbed wire fence. She endeavored to lift his body from the fence, but could not remember whether she succeeded or not. When other witnesses came upon the scene the body was still

hanging over the wires. Her husband was gasping, but soon ceased to breathe.

John L. Woods, a witness for the people, testified that he was milking cows in his corral upon the evening of the homicide. The corral was about fifteen hundred feet from the dam, and there was an unobstructed view. While milking he heard the report of a gun distinctly. "Immediately after the report of the gun I heard a man holler. It was a cry of distress. I am positive in my mind that it was a cry of distress.

"Q. Could it have been possible that you would mistake the cry of a man or command of a man to his horse, hollering 'Whoa,' or something of that kind, for the cry you heard? A. No; I think not. This cry continued for a short period, and then I heard another report of a gun.

"Q. Did you hear any cries or further moans or cries after the second shot? A. I think so; yes, sir. . . . The sound of distress called my attention that way, and I naturally enough looked that way. When the second shot was fired I was facing the scene of the shooting. When the second shot was fired I did not see the flash of the gun. I did not see the flash of the first gun. I was facing south when the first gun was fired, and facing the scene of the shooting when the second gun was fired." The witness further testified that after the shooting he thinks he heard somebody "holler 'Whoa,'" as though there was a horse unmanageable or something the matter with the horse. He could distinguish the difference between one making an exclamation, "Whoa" and another man making an exclamation "Oh" at that distance. "I could distinguish the difference in the tones of the words, the tones of the voice." "The voice that I heard holler 'Oh' was different from the voice that I heard holler 'Whoa.'" After the second shot he heard a woman's voice, which he recognized as being Mrs. Dice's voice, saying, "Go on, papa," something to that effect. And he heard a voice make some remark about having four shots left, and after that he heard a woman commence screaming.

Edwin Jameson, a witness for the people, was milking cows in the same corral with the witness Woods. He saw the flash of a gun in the direction of Grant Smith's house; almost immediately after that the report of a gun, and then heard "what

he took to be groans. It did not sound exactly like 'Oh' to me. It was more of a groan than an 'Oh.' It was loud enough to be heard distinctly where I was. These groans continued until the second shot was fired, and after the second shot was fired. There was a second shot fired." "I did not see the second flash of the gun at the time I heard the second shot. During the time the second shot was fired we were looking in that direction." He also heard a woman's voice after the second shot, saying, "Go on, papa," or "Go home, papa." Woods and Jameson went to Smith's together, and found the body lying as above described. Additionally, however, they noted that the string of the spring gun was under the body of the dead man, and by the testimony of one witness his hand was caught and tangled in it. The string was drawn taut, and the rifle had been discharged.

For the defense it was shown that neither Mr. nor Mrs. Dice knew anything of the existence of the spring gun. When they reached the dam Mrs. Dice took the shovel and began to remove the obstruction, doing the work instead of her husband because the land to be watered was hers. Her brother came out and asked her what she was doing. She told him she was taking out the dam. He told her that neither she nor her husband or any of her relatives could interfere with the dam, and that he did not care who told her that she had a right to run water through that ditch, she could not do it. "I said, 'Very well, if you can prevent me by law, I am perfectly willing you should do it.' He said: 'I will let you know that I don't do business that way,' and I said then, 'How do you propose keeping me from doing it?' and he said: 'I will take hold of you and hold you.' " Then he did take hold of her and pulled her toward the bank of the ditch. "I had hold of the shovel and was going to take the dirt up with it, and he took hold of me and it raised the shovel up this way when he raised my arm, and when I let loose of the shovel it fell over on top of the dam. So he pulled me over toward the north bank. He had hold of my left arm when he was pulling there. I still had hold of the shovel handle with my right hand, and just as I went to step upon the north bank of the ditch I stumbled and fell on one knee, and just then there was a shot fired. I could not see from where that shot

came in the position that I was. I fell on my knees on the bank of the ditch. One foot was down on the bottom of the ditch. After that shot went off, while I was in that position, I don't know whether I had gotten up on both feet and standing when there was a second shot." "When that first shot went off I did not hear anything except that my husband hollered to his horse. He hollered pretty loud, 'Whoa.' He hollered two or three times." "After the second shot was fired the deceased relaxed his hold upon my arm and fell limp just in front of me. He just sank down. He fell on the north bank of the ditch, just at the north end of the dam. He did not say anything when he fell. He lay there perfectly mute for an instant or so, and then there was a gurgling noise. He did not make any outcry of distress like 'Oh, Oh, Oh,' or anything of that sort, after the second shot went off. After the second shot there was no noise whatever. There was no sound until I called to Nellie. As soon as he began struggling I realized that he was wounded, and I called to Nellie, 'Nellie, you had better come to him,' and then Nellie screamed. After he was shot, as soon as he began struggling, he went over into the ditch, and during that struggle there was nothing but a gurgling sound. After Mrs. Nellie Smith came out I called to my husband, 'Go on, papa, go on,' and he says, 'I have three or four shots more.' Mrs. Smith said, 'You had better both go home.' Directly after the second shot was fired my husband said, 'Are you hurt or shot?' I don't know which; he spoke to me and said, 'Are you hurt or shot?' I said, 'No,' and looked around, just glanced around at him, and he was just in the act of stepping back into the buggy. And then I said, 'Did he hit you?' I thought possibly the first shot had struck him, and he said, 'No,' and it was after that that he made the remark that he had three or four shots left."

The defendant's testimony is in corroboration of that of his wife. After narrating the events and the conversation had at the time, as above given, he testifies: "Grant says, 'I propose to take hold of you and hold you.' Shortly after he said he was going to hold her I could see there was a scuffle between the two of them. The scuffle lasted five minutes, maybe a little longer, and I heard the report and saw the flash of some kind

of a gun, firearm. I thought it was a revolver or pistol of some kind. Before that I saw my wife as though she had stumbled. She fell just as the shot was fired, and it looked like she fell right up against the north bank of the ditch. At the time the shot was fired I honestly believed that my wife was shot there, and I honestly believed that he would turn on me and shoot me. I was afraid to go to her to lend her any aid or anything for fear he would shoot me. Just as the first shot was fired the horse made a lunge; that was right after the first shot, and he turned around like he was facing the east at the time the first shot was fired, and cramped the buggy right around. I was sitting in the buggy. Then I hollered 'Whoa' very loud three times at the horse, and I held the lines with my left hand, and my gun was under the buggy. At the same time I was trying to get the horse quieted down I reached down with my right hand and raised the gun out this way, and as soon as I got the gun out I dropped the lines and jumped out onto the ground and fired. I could see the form of a man. I did not see my wife after she fell until just after I shot. After the first shot, that I thought was a revolver, there was no groaning there at all. There was no utterance made there by any human being, except that I said, Whoa, whoa.' After I shot, Grant appeared to fall right down—collapsed, just fell right down, he made a very faint strangling noise. He did not holler 'Oh,' or groan any on that occasion at any time while I was there. I did not take time to draw the gun to my shoulder, because I expected to get a shot every instant myself, and I shot quick."

Upon surrendering himself to the constable, as he immediately did, defendant evinced solicitude that the constable should return to the place of the shooting and recover the weapon which he declared Grant Smith had and had used.

In support of defendant's account it is reasonably argued that if he had shot Smith from the buggy the course of the wound naturally would have been downward, but that the evidence shows that its course was horizontal. Such, indeed, is the evidence. While there is some difference as to the location of the wound, two witnesses testify that it penetrated the body in a horizontal direction. But there was no place of exit, and, while the testimony of skilled witnesses would have been of value, the testi-

mony of these particular witnesses, who were not shown to have had any experience in judging such matters, is of little weight.

The deputy coroner and undertaker testified: "I found a wound in his right side a little in front of the right side. I probed it. It did not go clear through. It was a little above the hip joint, and just below the ribs. The wound went right straight in as near as I could probe." The other witness, a justice of the peace, testified: "The wound was right in the side, and it ranged in my judgment right straight through, but it never came through. It was a solid hole. Three shots had varied and formed a kind of half circle right above the wound."

In the soft viscera of that portion of the body, torn and mangled by the discharge of the shotgun, fired at such close range, it would require the testimony of an expert surgeon, and perhaps a post mortem examination, before the range of the wound could be given with anything like satisfactory certainty.

Coming now to consider this evidence, which under the peculiar facts of the case it has seemed necessary to set forth at much length, it is to be remembered, as has often been said, that the verdict of the jury will not be set aside if the evidence is legally sufficient to uphold it. It may then at once be conceded that the defendant makes a strong showing of self-defense. But the strain of the case comes upon the question of the firing of the first shot. If the first shot was fired by the deceased while defendant's wife was struggling in his hands, and the defendant thought, as he testified he did, that his wife had been shot, and that he himself was in imminent danger of a like fate, unhesitatingly it may be said that he was justified in shooting. If, upon the other hand, the jury believed that the defendant himself fired the first shot while sitting in his buggy, and so slew his brother-in law, and that the second shot (that from the rifle) was fired by Smith in his dying struggles, then by none of the testimony in the case was defendant to be exonerated. On the part of the people it was shown first by Mrs. Smith that she saw the first shot fired, and that it came from the buggy, and was fired by the occupant of the buggy, and by the testimony of the witness Jameson that he saw the flash of the first shot. Neither Woods nor Jameson could see the flash of the second shot, though both were attentively watching. In this connection it was shown that it was impossible to see the flash of a

rifle the muzzle of which was but six inches from the ground, and which was fired toward the ground, from the corral where the men were standing. Weeds and a low bank obstructed the view from that elevation, but from the height of two feet and upward all objects were plainly discernible. Mrs. Smith likewise did not see the flash of the second shot. In all this there is sufficient legal evidence to have justified the jury in finding that the shot from the shotgun which was admittedly the fatal shot, was fired by Dice from the buggy, and that the rifle shot followed afterward. Having determined this, they of necessity determined against defendant's plea and evidence of self-defense.

The appellant complains of certain errors at law committed in the reception and rejection of evidence, some of which merit consideration. Luke Smith was permitted to testify to the substance of a conversation had between him and the defendant some time previous to the shooting, in which Dice made the remark "that he would have the water, or he would kill my brother Grant Smith." The witness upon direct examination had said that he did not "remember the substance of any great part of the conversation"; but that he remembered the substance of that portion of the conversation which related to the ditch and the water over which the defendant and deceased had had some disagreement. It was after his declaration that he remembered the substance of the conversation, so far as it pertained to these matters, that the court overruled defendant's objection and admitted the testimony. On cross-examination the witness declared that they talked over the water question for quite a while, and "this is only a small portion of the substance of what he said. All I remember, you might say, was the vital points of what he said. I remember only what I considered the vital points." Thereupon defendant moved to strike out the evidence, and his motion was denied. In this there was no error. What was sought to be elicited was the threat uttered by defendant to the witness against the life of the deceased; and, while the witness testifies that there was much more said upon the question of water, it is not made to appear that he did not give the substance of all the language used by the defendant in uttering the threat.

The court sustained the objection of the prosecution to a question put to the witness Hively by the defendant as to whether the defendant did not make certain specified statements to the justice of the peace after he had come to Tipton and given himself to the constable, to the effect that Grant Smith had fired a pistol, as he supposed at him, or his wife, before he (the defendant) fired. The rejection of this evidence was proper. It was but a declaration by the defendant in his own interest, made after the lapse of considerable time, and under no possible view a part of the *res gestae.*

The witness Jameson was asked on cross-examination how many cows he was milking upon the evening of the shooting, and answered that he did not remember. The defense then offered in evidence the testimony of the witness given at the preliminary examination, and that portion of it containing the following question and answer:

"Q. How many cows did you have there in that corral?

"A. Nine, I believe."

This was not impeaching nor contradicting evidence, and it was evidence adduced upon an immaterial matter. The witness had admitted that his recollection of events was fresher at the time of the preliminary examination than it was at the time of the trial. The evidence was, therefore, properly excluded.

The witness Anna Dice had testified that she was the wife of defendant and the mother of seven children. She was asked the ages of the children, and an objection to the question was sustained. She was again asked: "Is it not a fact that your youngest child is only two years old?" and the answer was stricken out. The evidence was properly excluded. It was not shown that the ages of the children had any bearing upon the case, and to prove that they were of tender years could only have been designed to move the jury to compassion.

The court instructed the jury as follows:

"Murder is the unlawful killing of a human being, with malice aforethought. *The word 'malice' imports a wish to vex, annoy, or injure another person, or an intent to do a wrongful act, established either by proof or by presumption of law.* Malice may be express or implied. It is express when there is manifested a

deliberate intention unlawfully to take away the life of a fellow creature. It is implied when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart."

It is insisted that the court erred in giving to the jury the italicized portion of the instruction. It is the exact language of subdivision 4 of section 7 of the Penal Code; but it is urged that the malice which is essential to the crime of murder is the malice of section 188 of the Penal Code, which is next defined in the instruction; and that the instruction as given was therefore misleading, confusing, and injurious. We think the complaint unfounded. The court but instructed the jury as to the general import of the word "malice," and immediately and in the same connection specifically defined the word when used in the code as an element of the crime of murder.

The court in instructing the jury upon the degrees of murder, and upon the crime of manslaughter, in each instance declared to the jury the punishment which upon their verdict it would be the duty of the court to impose by way of judgment. To do so is of course necessary in instructing the jurymen upon their power and duty in the event that they should render a verdict of guilty of murder in the first degree. But, while it may not be said that the practice is error, it is not to be commended. Excepting in the instance mentioned, with the punishment of the crime the jurors have nothing to do, and to inform them of the consequences of their verdict in a matter not appertaining to their duties may, and it is a part of judicial knowledge frequently does, excite sympathy for a defendant and thus lead to abuses and failures of justice by compromise verdicts or disagreements and mistrials. But the impropriety is not one of which a defendant may justly complain, since the influence upon the jury is most favorable to him.

The other exceptions to the instructions do not require specific consideration.

For the foregoing reasons the judgment and order appealed from are affirmed.

Garoutte, J., Van Fleet, J., Harrison, J., McFarland, J., and Temple, J., concurred.

Rehearing denied.