[Crim. No. 8977.   Second Dist., Div. Two.   Aug. 16, 1963.]

THE PEOPLE, Plaintiff and Respondent, v. LUTHER POWELL, Defendant and Appellant.

Hecker, Dunford & Kenealy and George L. Hecker for Defendant and Appellant.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and Gilbert F. Nelson, Deputy Attorney General, for Plaintiff and Respondent.

HERNDON, J.—Defendant appeals from the judgment of conviction entered against him following the return of a jury verdict finding him guilty of murder of the second degree. The sufficiency of the evidence to sustain the verdict is not

challenged. Viewed most favorably to the People, it may be summarized as follows: At approximately midnight on August 29, 1962, the victim, Latimore Harvey, Jr., entered the Starlite, a bar and café located at 41st Street and Broadway in Los Angeles. Appellant, Luther Powell, was the cook and operator of the kitchen section of the establishment. This kitchen section was separated from the bar and booths by an open doorway. Several of the patrons who were present testified that after entering the front door, the victim walked toward the rear of the establishment and stopped near a juke box where he could see appellant through the doorway of the kitchen. The victim then pointed his finger at appellant and said:

"You dirty . . . , I am going to call the police this time because I think you are a dirty. . . ."[1] The victim then continued further toward the rear of the establishment walking toward a telephone booth. Several witnesses observed that the victim had a dime in his hand. Immediately thereafter, appellant came out of the kitchen doorway and walked to the juke box carrying a revolver in his hand. He leveled his arm, taking aim over the juke box and fired at the victim as the latter walked toward the telephone booth. The victim continued to walk on and he entered the telephone booth. Appellant kept on firing his revolver and the deceased slumped to the floor of the phone booth against the door thereof as it stood at least partially open. Appellant replied to the remark of the deceased during the shooting. He said:

"I am getting tired of you dirty . . . messing with me. . . . You started, you . . . coming in here ruining this business." Appellant kept pulling the trigger of the revolver after it ceased firing and thereafter it began to click. Appellant then said: "Where the rest of them bad [obscenity]."

A cruising police car received a radio call reporting the shooting. When one of the police officers entered the establishment, he found appellant with the gun in his hand. Appellant handed the officer the gun; it contained six discharged cartridges. The officer asked appellant about the man he had shot and appellant told the officer that he would find him in the phone booth. The officer then asked appellant why he had killed the deceased. Appellant replied: "That nigger [obscenity] has been coming in here and bothering me. I am getting tired of being called a nigger by him, and I just finally decided to shoot him and get rid of him."

---

[1] Unprintable obscenities are omitted.

The victim was found slumped down in the telephone booth with his arm extended. A dime lay on the floor of the booth. The autopsy report showed that the victim had been shot four times in the back and twice in the chest. Two of the bullets went through the heart, one through the lung and another through the aorta. Two of the shots not only pierced the body of the deceased but passed through it, making eight wounds in all. Any one of several of the wounds could have been the cause of death.

Appellant gave a statement to the police in which he said that he rented the café portion of the Starlite; that he had been harassed by a group of individuals during the past two months calling him dirty names and he had "run them out." He said that on the day of the killing he had ordered a prostitute and a group with her to go away; that he had sensed there might be trouble; that he had taken the gun from the cash register in front to the kitchen and put it on a shelf; that there had been trouble with some customers near the front door about 11 p.m., and he had gone up front and put them out; that when he returned to the kitchen he heard the victim making a statement; that he grabbed the gun and fired and then walked around and took one more shot but didn't remember anything after that.

The officer asked appellant why he shot the deceased, and appellant replied, "Well, he will never call me another black [obscenity]." When asked if this was the only reason he shot him, appellant replied, "That is the only reason I shot him."

At the trial it was the theory of the defense that the victim had entered the kitchen in a violent and threatening manner and defendant had fired one or two shots in self-defense. Defendant stoutly maintained that he had shot the victim, not because of anger aroused by the language of the decedent, but because appellant feared for his own life.

■ By way of his initial assignment of error, appellant argues that the giving of an instruction in the language of Penal Code section 7, subdivision 4, in conjunction with admittedly proper instructions constituted prejudicial error.[2]

---

[2] "The words 'malice' and 'maliciously' import a wish to vex, annoy or injure another person, or an intent to do a wrongful act." (Cf. CALJIC No. 77; Pen. Code, § 7, subd. 4.)

"Murder is the unlawful killing of a human being with malice aforethought.

"Such malice may be express or implied. It is express when there is manifested a deliberate intention unlawfully to take away the life of a fellow creature. It is implied when no considerable provocation appears,

However, he recognizes the necessity for his concession that there are no decisions so holding and that, in fact, in all cases in which the question has been considered it has been held that, while the giving of the general definition of malice is unnecessary and perhaps inappropriate in a murder trial, nonetheless any error that might otherwise result therefrom is cured by the full and proper instructions here requested by both parties and given by the court. (*People* v. *Berry*, 44 Cal2d 426, 432 [282 P.2d 861]; *People* v. *Chavez*, 37 Cal.2d 656, 666-667 [234 P.2d 632]; *People* v. *Dice*, 120 Cal. 189, 202 [52 P. 477]; *People* v. *Miceli*, 101 Cal.App.2d 643, 650 [226 P.2d 14]; *People* v. *Waysman*, 1 Cal.App. 246, 248-249 [81 P. 1087].)

Appellant's second assignment of error, relating to the jury instructions, concerns the court's decision not to give the following instruction requested by appellant: ''You are instructed that as a matter of law, heat of passion as previously defined can be generated by words of abuse.''

In support of the propriety of this instruction, defendant cites *People* v. *Valentine*, 28 Cal.2d 121 [169 P.2d 1]. The

---

or when the circumstances attending the killing show an abandoned and malignant heart.

''Malice aforethought, either express or implied, is manifested by the doing of an unlawful and felonious act intentionally, deliberately, and without legal cause or excuse. It does not imply a pre-existing hatred or enmity toward the individual injured.'' (Cf. CALJIC No. 301; Pen. Code, §§ 187, 188.)

''Manslaughter is the unlawful killing of a human being without malice. One kind of manslaughter, the definition of which is pertinent to this case, is voluntary manslaughter, being that which is committed upon a sudden quarrel or heat of passion.'' (Cf. CALJIC No. 308-A; Pen. Code, § 1921, subd. 1.)

''Manslaughter is distinguishable from murder principally in this: That though in manslaughter the act which occasions the death be unlawful or likely to be attended with bodily mischief, yet the malice, either express or implied, which is an essential element of murder, is wanting, and the act being imputed to the infirmity of human nature, the correction ordained for it is proportionately lenient.

''When the mortal blow, though unlawful, is struck in the heat of passion or is excited by a sudden quarrel such as amounts to adequate provocation, the law, out of forbearance for the weakness of human nature, will disregard the actual intent, and will reduce the offense to manslaughter. In such a case, even if an intent to kill exists, the law deems that malice, which is an essential element of murder, is absent.

'' [There are many acts which are lawful but nevertheless endanger human life. If a person causes another's death by doing such a dangerous act in an unlawful manner or criminally negligent manner, without realizing the risk involved, he is guilty of manslaughter. If, on the contrary he had realized the risk and acted in total disregard of the danger to life involved, malice would be implied and he could be guilty of murder.]'' (Cf. CALJIC 310.)

decision in the *Valentine* case, however, makes clear that the court was not there considering whether an instruction in the form of such an abstract proposition as proffered by defendant could or should be given to the jury. Prior to the *Valentine* decision it had been held that it was proper to instruct the jury that "no words of reproach, however grievous, are sufficient provocation to reduce the offense of an intentional homicide from murder to manslaughter." The court in *Valentine* rejected this instruction and adopted the instruction set forth in *People* v. *Logan*, 175 Cal. 45, 49-50 [164 P. 1121], which is consistent with those given the jury in the instant case.[3]

It is for the jury in each instance to determine whether the provocation shown by the evidence, including words and actions, was sufficient to create the required degree of pas-

---

[3] "'To reduce an intentional felonious homicide from the offense of murder to manslaughter upon the ground of sudden quarrel or heat of passion, the provocation must be considerable, that is to say, it must be of such a character and degree as naturally would excite and arouse the passion, and the assailant must act under the smart of the sudden quarrel or heat of passion.

"'Heat of passion', as the term is used in our law, means such a passion as naturally would be aroused in the mind of an ordinarily reasonable person of average disposition in the same or similar circumstances as those in question, and such as would cause him to act rashly, without reflection and deliberation, and from passion rather than from judgment. Hence the defendant may not set up his own standard of conduct and be permitted to justify or excuse himself merely because his passions were aroused. To apply the proper standard by which to judge the conduct of the defendant, you will ask and answer whether or not the ordinarily reasonable person, if placed in the same position in which the defendant found himself and if knowing what the defendant then knew, would have been thrown into a heat of passion.

"'If there was provocation, but of slight and trifling character, and of a nature not calculated to naturally arouse the passion, or if sufficient time elapsed between the provocation and the fatal blow for passion to subside and reason to resume its empire, and if an unlawful killing of a human being followed such provocation and had all the elements of murder, as I have defined it, the mere fact of such slight or remote provocation will not mitigate the offense to manslaughter." (Cf. CALJIC No. 311.)

"Neither the passion of fear, of itself, nor the passion for revenge, of itself, nor the passion induced by and accompanying or following an intent to commit a felony, of itself, nor any or all of these passions, in and of themselves, constitute the heat of passion referred to in the law of manslaughter which I have stated to you. Any or all of such specific emotions may be involved in a heat of passion that dethrones judgment and substitutes impulse and rashness, but also any one or more of them may exit in the mind of a person who acts deliberately and from choice, following his own reasoning, howsoever good or bad it may be. Hence the law sets up the standard and requires the test that I previously have stated to you for determining whether or not the defendant acted under heat of passion." (Cf. CALJIC No. 311A.)

sion, and a specific statement of what *"as a matter of law"* may be abstractly true would merely tend to confuse if not mislead the jury as to its duties and prerogatives.

Moreover, in the instant case appellant continually re-iterated and emphasized the alleged fact that he did not shoot the deceased because of any anger or passion generated by the gross vulgarities used, but, on the contrary, that he had acted solely in defense of his person. The giving of such an instruction in the circumstances would have been detrimental to appellant's case, for it would have been contrary to the theory of his defense which, if accepted by the jury, would have resulted in his acquittal. Certainly its rejection was not prejudicial error.

█ Appellant's final assignment of error relates to the admission into evidence of a written summary of a state-ment made by appellant to a police officer shortly after the shooting. Concededly appellant freely and voluntarily en-gaged in conversation with the officers for over an hour. One of the officers wrote a summary of the cogent portions of this conversation and asked appellant to read it and sign it. He did sign it, but testified that he had not read it and did not wish to sign it because he knew it was incomplete, i.e., he knew that everything he had said during the conversation could not possibly be contained on two pages.

Although appellant suggests that his actual signing of the document was the result of duress, even his own version of the proceedings totally refutes this contention, and, insofar as his description of the events is at variance with that of the officers, the resolution of this conflict was properly one for the jury, and its "determination will not be disturbed unless it is without evidentiary support." (*People* v. *Burwell,* 44 Cal.2d 16, 30 [279 P.2d 744].)

█ Actually the true thrust of appellant's arguments on this point is not that the contents of the statement are com-pletely false, but merely that they are incomplete and, there-fore, fail to present a true picture of the events in question. This, however, inevitably is a characteristic of every summary of this type. Certainly no prejudice resulted therefrom, for both appellant and the officer testified concerning other sub-sidiary matters that were contained in appellant's oral state-ments but which were not included in the written summary.

█ Appellant also comments on the fact that a tape re-cording was made of his conversation with the officers and later "destroyed." Actually, the officer testified that the re-

cording was completely garbled and totally unintelligible, perhaps because made on a used tape, and that it was subsequently erased. Credibility of witnesses is for the trier of the facts. (*People* v. *Kemp,* 55 Cal.2d 458, 471 [11 Cal.Rptr. 361, 359 P.2d 913] ; *People* v. *Barbera,* 50 Cal.2d 688, 692 [328 P.2d 973].)

And, in any event, it has been held that what the officer heard is primary evidence, whether all that the officer heard was incorporated in a recording or not. (*People* v. *Sweeney,* 55 Cal.2d 27, 38 [9 Cal.Rptr. 793, 357 P.2d 1049] ; *People* v. *Sica,* 112 Cal.App.2d 574, 588 [247 P.2d 72].)

The judgment is affirmed.

Fox, P. J., and Ashburn, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied October 9, 1963.