THE STATE OF OHIO, APPELLEE, *v.* CARDER, APPELLANT.

[Cite as State v. Carder, 3 Ohio App. 2d 381.]

(No. 382—Decided September 27, 1965.)

*Mr. E. Raymond Morehart,* prosecuting attorney, for appellee.

*Mr. Richard C. Gerken* and *Mr. Forrest P. Moore,* for appellant.

382

McLaughlin, J. The defendant, a minor, a high school junior, aged 16-¾ years, was convicted by a jury on two counts of first degree murder. Mercy was recommended. He was sentenced accordingly.

He makes the following assignments of error:

1. The court erred in admitting evidence of statements purportedly made by the defendant after his arrest and before defendant was taken before the judge of the Juvenile Court.

2. The court erred in admitting into evidence the state's exhibit 36, consisting of the defendant's fingerprints and picture and appearing on a "criminal card," although the defendant was a juvenile.

3. The court erred in admitting into evidence numerous pictures of the decedent's body, which, cumulated, tended to incite prejudice and inflame the minds of the jury.

4. The court erred in admitting into evidence statements purportedly made by the defendant, which statements were not voluntarily made, and the admissions of such statements were in violation of defendant's right under the "due process clause" of the Constitution of Ohio and the Constitution of the United States.

5. The court erred in permitting the prosecuting attorney on *voir dire* examination of the jurors to inquire whether or not the jurors would take into consideration the defendant's age.

6. The court erred in its charge to the jury by giving incorrect instructions as to the test to be applied in considering the voluntariness of defendant's alleged confessions.

7. The court erred in admitting into evidence exhibits which were taken by unlawful search and seizure in violation of defendant's rights under the Constitution of Ohio and the Constitution of the United States.

8. The court erred in its charge to the jury by charging on the subject of "robbery" when there was no evidence in the record that a robbery had been committed or attempted.

9. The court erred in its charge to the jury by instructing the jury that the death of the decedent could have taken place on or after April 6, 1964, and before June 10, 1964.

10. Other errors manifest on the record.

The deceased woman, Vanetta Brucker, operated a small

grocery, confectionery, and dance hall just outside the city limits of Lancaster.

At about 11:00 o'clock on the evening of April 6, 1964, one Dick Mattox reported to the city police that he had just come from the Brucker store and that Vanetta Brucker had been killed. The county sheriff's office, the prosecutor, the coroner, and the Bureau of Criminal Investigation at London were promptly notified.

The body was found in a large pool of blood on the dance hall floor. She was dressed in a blouse and slacks. An ice pick was transfixed in the neck, from the right protruding out of the left side. Its handle broken in two pieces was on the floor nearby. There was a meat cleaver lying on the right shoulder with its broken handle nearby. A butcher knife was under the body.

Dick Mattox, who made the initial report to the police, told the police of a telephone conversation with the deceased about 10:00 o'clock and that she had asked him to wait because someone was at her door in a white hat. The defendant was known to wear a white helmet while riding his motorcycle. He was also known to "hang around" the Brucker store often since it was near his high school. He thus became a prime suspect. Two deputies went to defendant's home and talked to him in the presence of his father. He told them he had worked that evening at the Tiki Bowling Lanes and came home about 11:00 p. m. The deputies left only to return shortly.

On their second visit they picked up a white helmet which they had noticed on a chair. They took it with them when they left, after assuring defendant that it would be returned.

The deputies returned a third time, and this time they asked to see his clothes and his motorcycle. The defendant showed them to the deputies. His father was there. The defendant was then taken to the sheriff's office. His father followed in his own car.

At the county jail his father was advised that they would hold defendant until morning at which time the prosecutor would question him. He was placed in a cell away from other prisoners.

Early on the morning of April 7th, the father was permitted to visit the defendant in his cell and to give him a pre-

scribed insulin shot since he was diabetic. His employer, Richard Bird, proprietor of the bowling lanes where the defendant worked during evening hours, also visited him early that morning. Defendant gave Bird certain information which resulted in the finding of his bloody clothes in a garbage can back of the city hospital.

The defendant's brief recites events that followed:

"* * * In the morning, defendant's father had ·contacted an attorney, one, James Lantz, * * *. Mr. Lantz arrived about 8:30 and talked to the defendant briefly. * * * Mr. Lantz had represented Mrs. Brucker. * * * He could not represent the defendant. He did tell defendant's father that he would contact another attorney. * * *

"The defendant was taken into the back room of the sheriff's office at about 9:00 o'clock on the morning of April 7th, where he was interrogated * * *. Shortly after the interrogation started, defendant's attorney, Mr. Jackson arrived. This fact was made known to the sheriff's office, but neither the attorney, nor defendant's parents, who were present, were permitted in the room until after the interrogation was completed sometime after 12:00 o'clock noon. * * * The statements made by the defendant during the interrogation were not reduced to writing and were not signed by the defendant. The only record made consisted of notes made by one of the police officers. During the period of interrogation, defendant made at least two alleged confessions.

"The defendant was held in the county jail until April 11, 1964, at which time he was taken before the juvenile judge for the first time. * * *"

During trial, in the absence of the jury, before any testimony was offered, the trial court heard a defense motion to suppress the alleged confession as well as certain evidence (the white helmet, his bloody clothes, and the motorcycle) obtained as the result of alleged unlawful searches and seizures.

After a lengthy hearing, the trial court overruled the motion to suppress, and found as follows:

"2. The confession or statement was made voluntarily by the defendant after he had talked to his father, his employer, a lawyer sent to the jail by his father, and a juvenile officer from the Juvenile Court. His physical and mental facilities were

not impaired because of the use of drugs or because of his diabetic conditions.

"3. The search and seizure insofar as the helmet is concerned was reasonable and made with the consent of the persons in control of the premises involved. Facts in possession of the police were sufficient to cause a reasonable and prudent man to believe that a felony had been committed and that this defendant committed it. The testimony does not disclose the manner in which the seizure of the motorcycle or motorbike was made. The search for and examination of said motorcycle, however, was reasonable and made with the consent of the defendant."

The substance of the confession or self-incriminating statement was later admitted in evidence through the testimony of William Rutherford, the juvenile probation officer, who did most of the questioning. The accused told two stories and later said that the first story he had told was not true and that he would tell the true story. He then said that he went to the store about 10:00 o'clock p. m.; that Mrs. Brucker came to the door and invited him in. " * * * Later she said: 'Well, I'll play some music and we'll dance.'

" * * * and he got up * * * and after they had danced a little bit, * * * she put her arm around him, and I asked him if she made any other advances toward him, and he said she took her hand and placed it down in the front of his pants, * * * and he said he called her 'filth,' and that he gave her a shove away from him and that she came back toward him and that he hit her and knocked her down and that her glasses flew off * * *, she had picked up an ice pick, and that he grabbed the ice pick from her hand and grabbed her hand and that she pulled toward him and that the ice pick ran into her neck, and he said then that she ran and got * * * a hatchet, * * * and that she grabbed it and started to strike at him with it, and he took it from her hand and that he hit her with it. * * *

"Q. Did he say how many times he struck her with the meat cleaver? A. * * * more than once. He had hit her on several occasions * * *.

" * * * and he got ahold of the body and drug it toward the door and that one of her shoes came off, * * * he took her rings

off and went to the cash register and took out some money.
* * * look like a robbery * * *and put them in a paper sack * * *
and left by the back door, and got on his motorbike * * *."

At the trial the accused testified in his own behalf and told
a story different from either story which he had told the offi-
cers.

We attention the assignments of error in order. In assign-
ments of error Nos. 1 and 2, it is claimed that certain procedur-
al requirements of Chapter 2151, Revised Code, were not follow-
ed.

Violation of Section 2151.25 is claimed since the defendant
was not taken *directly* before the Juvenile Court, upon arrest.
And/or violation of Section 2151.31 is claimed since he was not
taken immediately to the court or place of detention designat-
ed by the court upon being taken into custody. And violation
of another paragraph of Section 2151.31 is claimed since he was
fingerprinted on a criminal card.

The Ohio procedure is stated in these sections, as follows:

2151.25. "When a child is arrested under any charge, com-
plaint, affidavit, or indictment, whether for a felony or a mis-
demeanor, such child shall be taken directly before the Juven-
ile Court."

2151.31. "Whenever any officer takes a child into custody
* * *, such child shall be * * * taken immediately to the
court or to the place of detention designated by the court, and
the officer taking such child shall immediately notify the court
* * *

"* * *.

"* * * When the judge permits the fingerprinting of any
child, the prints shall be taken on a civilian and not a criminal
card and shall be kept only in the civilian file. Provided that
any child recognized to the Court of Common Pleas, under Sec-
tion 2151.26 of the Revised Code, shall not be exempt from fin-
gerprinting and photographing. * * *"

To paraphrase the words of Doyle, J., in *State* v. *Stewart*,
120 Ohio App. 199, at page 205, there were "perhaps statutory"
violations.

For a court to rule that these slight departures from pre-
scribed procedural requirements "constituted a denial of due

process; and thereby prejudicial error in the state's case, to one who is later ordered by the Juvenile Court to appear before the Court of Common Pleas to answer to a charge of murder would be carrying the rule of due process to absurd limits."

We find that there was substantial compliance with Chapter 2151, Revised Code.

Assignments of error Nos. 1 and 2 are overruled.

As to assignment of error No. 3, such photographs as were admitted in evidence all tended to show the position of the body, its appearance and its relation to other objects in the room where found. Their admissibility was within the sound discretion of the trial court. We find no abuse thereof. Overruled.

The crux of this appeal is the fourth assignment of error. This goes to the admission of the self-incriminating statements or oral confessions made by the accused on the forenoon of April 7th, to the corps of investigators including the juvenile probation officer, the prosecutor, a city patrolman who made notes, and sheriff's deputies. It is claimed that such statements were not voluntarily made and hence the due process clauses of the state and federal Constitutions were violated.

Exceptions were properly saved to the ruling of the court on the motion to suppress these alleged confessions, *supra.*

Extrajudicial confessions or self-incriminating statements, especially those made by juveniles, deserve close scrutiny by the courts. The United States Supreme Court in recent years, beginning with the case of *Haley* v. *Ohio* (1948), 332 U. S. 596-625, has held that the ruling of the trial court and the finding of the jury in a criminal case on the voluntary character of a confession do not foreclose independent examination.

Since *Haley,* the leading case involving juvenile confessions, decided by that court, is *Gallegos* v. *Colorado* (1962), 370 U. S. 49. In both cases, confession was held inadmissible and conviction was reversed. Justice Douglas, author of the majority opinion in both cases, stated in *Gallegos,* at page 55: "There is no guide to the decision in cases such as this, except the totality of circumstances * * *."

*Haley* and *Gallegos* are distinguishable on the totality of circumstances.

388

*Haley* was a 15 year old Negro boy who was arrested at night, questioned for 5 hours by relays of police, without friend or counsel being present, when he confessed. He was not advised of his right to remain silent or his right to counsel until those statements were recorded in the written confession which he signed. He was held incommunicado for three days, during which a lawyer retained by his mother was twice refused permission to see him.

*Gallegos* was 14 years of age and orally admitted his guilt upon arrest. He was held from January 1st to January 7th when he signed a written confession. He was advised as to his right to counsel but did not ask for a lawyer. His mother was refused permission to see him on January 2nd. He had no adult visits or advice of any kind prior to signing the confession.

In the instant case, John L. Carder was 16-¾ years old, near the close of his junior year in high school. He was taken into custody and kept in the upstairs of the county jail, away from other prisoners, in "juvenile quarters, * * * the only place you have in this county for detaining juvenile offenders." In fact, from the totality of circumstances surrounding his detention and questioning, it is apparent that the accused was treated with unusual fairness and consideration by the officers. In their questioning, they "reasoned" with him without heat of mind or temper. The record shows that he was told by the prosecutor, the deputies and by the juvenile probation officer, several times, "that he did not have to talk." The juvenile probation officer did most of the questioning. Accused was not denied counsel.

It is true that after the accused had talked with one lawyer, his parents appeared after the questioning had started, with another lawyer who became his trial counsel. The persons who were questioning the accused then insisted to the parents and the lawyer that they finish their questioning and then they could see the accused. But there is evidence that the accused did not wish to see his parents or the attorney. He specifically asked if he had to face them. He also asked the patrolman who had taken notes to stay with him when they came in the room. He asked that his confession be broken "easy" to

his mother. Patrolman Zollars did stay and go over his notes in their presence, pausing many times to ask the accused to confirm them.

Under this "totality of circumstances," for his statements to be inadmissible we would have to hold that any self-incrimination of a person under 18 years old is involuntary unless his parents or his attorney are present. We would also have to hold that such minor is not mature enough to make a voluntary confession or waive the presence of his parents or his lawyer during any conversation with the police. This is not the law. See *State* v. *Stewart,* 176 Ohio St. 156, first paragraph of the syllabus.

There is an entire absence of any force, coercion or compulsion, physical or mental. We find nothing to make the confession or his waiver of parental or counsel presence anything other than completely voluntary.

We thus distinguish *Haley* and *Gallegos,* the two cases involving confessions by juveniles, upon which this accused so greatly relies. The fourth assignment of error is overruled.

As to the fifth assignment of error, we find no prejudical error in the prosecutor's *voir dire* examination of prospective jurors. Overruled.

As to the seventh assignment of error which goes to the admission into evidence of certain exhibits, to wit, the helmet (motorcycle parts were marked for identification exhibit 28, but never offered or admitted) and clothing of the accused, such evidence was obtained with the aid and assistance of the accused and his father. Overruled.

The sixth, eighth, ninth and tenth assignments of error go mostly to the trial court's charge to the jury. We have carefully examined the charge and find no prejudicial error. Overruled.

Our scrutiny of the record, the conduct of able trial counsel for both parties, the excellent briefs and arguments of accused's counsel, and the entire conduct of the trial court, convince us that the accused was accorded a fair trial. It does not affirmatively appear from the record that the accused was prejudiced thereby or prevented from having a fair trial. See Section 2945.83, Revised Code.

*Judgment affirmed.*

VAN NOSTRAN, J., concurs.

RUTHERFORD, P. J., dissenting. John Lincoln Carder was a 16-year-old boy when arrested and placed in detention at the county jail at 2:30 a. m. on Tuesday, April 7, 1964.

At 7.00 a. m. his father was permitted to give him a shot for his diabetic condition.

At about 8:00 a. m. Mr. Lantz, an attorney, but not his attorney, was permitted to talk to him. Mr. Lantz became attorney for the administrator of the decedent's estate.

At about 8:00 a. m. Dick Byrd, for whom John Carder had worked part time after school hours at the bowling alley, talked to him.

At 9:00 a. m. he was taken into the back room, the interrogation room of the Fairfield County Jail. At this time an interrogation began which lasted three or possibly four hours. Those making inquiry were the prosecuting attorney, two men from the Bureau of Criminal Investigation at London, Ohio, a city patrolman, a juvenile probation officer, a deputy sheriff, Dick Byrd, and the sheriff, against all of whom John Carder was alone.

At first he volunteered a story which did not involve him in the murder of Vanetta Brucker.

At about this time his parents with an attorney they had hired to represent John arrived at the jail. They were refused admission to see John and what happened from this point on can best be illustrated by quoting testimony of those who took part in the inquisition.

The juvenile probation officer testified as follows:

"Q. Are we to understand that you just told him what happened and he went ahead and told the story? A. Pretty much that way. He told us two different stories, but we told him we didn't believe the first one, and then he told us the second one.

"Q. Did this questioning require repeated questioning for details or did all this information come out voluntarily? A. No, there was repeated questioning.

"Q. In other words you would contradict him when things didn't match up with what you thought were the facts? A. That is right.

"Q. And you'd say: 'Now John, this couldn't be true be-

cause of this or that?' A. We confronted him with a lot of physicial evidence that we had obtained already to show him that we didn't believe part of the story that he had told us.

"Q. Are we to understand that you didn't get aggravated and maybe raise your voice a little, and maybe get a little red in the face when you thought for sure he wasn't telling you what the facts were? A. I wouldn't say anybody there wasn't aggravated a little bit at some time. When a vicious murder is committed law enforcement officials do get aggravated.

"Q. They do? A. Yes, they do.

"Q. Do you recall if at any time while you were at the jail questioning the defendant that morning, it became known to you or to any of the persons in the room questioning the defendant, that I, his attorney, and his mother and his father were asking to see him? A. Yes, you were.

"Q. And do you know about when you found out that we were trying to see him? A. No, I don't recall exactly when I found that out. It was sometime during the morning.

"Q. It was rather early in the morning wasn't it, Bill? A. I expect. Sometime after the questioning had started, I believe.

"Q. But long before it finished? A. Yes, sir.

"Q. And would you say whether you know as a matter of fact, that the persons who were questioning the defendant insisted that they would finish their questioning and then, we could see the defendant? A. I expect that is right.

"Q. In other words, you intended then to finish your questioning and then you would permit his parents and his attorney to see him? A. John didn't want to see his parents to begin with.

"Q. I believe you told me the other day that during the time that you were questioning the defendant that morning, you were aware of the fact that his mother and father and attorney were waiting to talk to him, but that you intended to finish your questioning before you permitted them to talk to him. Did you tell me that or not? A. Yes, sir, I did. That was on the advice of the prosecuting attorney."

The patrolman testified:

"Q. Was there someone pushing you? A. Yes, Mr. Jackson (attorney Jackson) was out in the hall and I wanted to talk to this man as much as I could to find out what connection he had with this murder.

"Q. Well I believe that. A. And I am sure after you get ahold of him, I am not going to talk to him hardly at all."

At his trial John denied killing Vanetta Brucker. He testified that after seeing another man run he went into the room and found Vanetta Brucker dead; that he picked her up and also took her rings and some money. In the morning he had told Dick Byrd where he had put his clothes and Dick Byrd told the officers as soon as he came downstairs.

At the trial Patrolman Zollars testified in regard to the inquisition on the morning of the 7th as follows:

"A. What I recall is that Mr. Byrd told him, and in about these words: 'You know, John, I told you I wouldn't tell these people.' I don't know exactly what he was referring to, but he said this, and he said: 'You know they are going to find out anyway. There are a lot of things have happened, and they have got a lot of evidence that you did this thing, and why don't you tell us the truth or why don't you tell us about it?' "

In regard to John's condition the probation officer testified:

"Q. Did you notice anything about the defendant while you were there, that gave you the impression that there was anything abnormal about him, or that he was acting abnormally in any way? A. No, only the fact that he had cried, and he had cried about this thing, and he was snotted at the nose a little bit, but that was all that I seen, which I don't think was out of the ordinary under the circumstances."

At lunch time, lunch was not provided for John by the officials. After twelve his father went out and bought a lunch which was given to John but his father was not permitted to take it to him and the questioning continued.

During all this time, being after 9:00 a. m. on a Tuesday, the Juvenile Court which was nearby was open, but John was not taken before the Juvenile Court until four days· later and there is no evidence that the juvenile judge was advised.

There is testimony that John did not want to see his folks or an attorney and that he was told he did not have to answer. There is no testimony that he was ever advised that what he

would say might be used against him. From the evidence I cannot find that he knew before the inquisition was over that his attorney and parents had been waiting outside and wanting to see him; rather, it appears that he was advised only at the close of the inquisition, of the fact that his parents and attorney had been waiting to see him.

Patrolman Zollars testified:

"A. Because, during the questioning, we asked him if he wanted to talk to his mother and father or his attorney and he said, no, that he didn't. He didn't want to see them. He asked: Did he have to see them, and we told him: No, he didn't have to see them, and he asked then: Did he have to go home, and we said: No, he did not have to, and we continued questioning him, and then, later, I asked him again: 'Do you want to see them? They are out there waiting, and they want to see you and Mr. Jackson wants to see you.'"

This had to be at the close of the inquisition for John answered at that time: "Well, I can't tell them. Will you tell them easy for me." It was then that his attorney and his mother and father were brought in.

John testified as follows:

"Q. Mr. Carder, you were not forced to tell these authorities anything, were you? A. If I was to answer that under my opinion you mean?

"Q. Yes. A. Yes, I would say I was.

"Q. And in what respect were you forced? A. In respect what you said. I did tell them the first story, and I was so confused when I told that, to my knowledge, and they didn't believe that, and they told me things that I guess did happen that night, that I never knew before, and they told me different things and kept going over it and over it, and when I'd state something they'd say: 'Well that isn't true, wasn't it more likely this?' And then I'd state that to agree with them, and this would under my opinion, through all the pressure be what I would call forced. I would say it was forced. Yes, I would.

"Q. Would you say you were forced? A. To my opinion, yes, sir.

"Q. What complaints do you have about the treatment you received? A. In the room where they were questioning me?

"Q. That is right. A. Only when one got finished, the other

would start in, and when he got finished the other one would start in, and I was so mixed up after talking to them I didn't know what I was doing.

"Q. You didn't know what you were doing? A. Not to my knowledge, no."

"Q. Weren't you told by myself, as prosecuting attorney, that you didn't need to tell us unless you wished to? Weren't you told that? A. I would say, no, to what I remember. I do not remember those statements. They could have been made but I would say no."

Section 2151.01, Revised Code, provides in part:

"(1) 'Child' includes any child under eighteen years of age."

Section 2151.25, Revised Code, provides:

"When a child is arrested under any charge, complaint, affidavit or indictment, whether for a felony or a misdemeanor, such child shall be taken directly before the Juvenile Court. * * *"

Section 2151.31, Revised Code, provides:

"Whenever any officer takes a child into custody * * * such child shall be placed in the custody of a probation officer * * * or taken immediately to the court or to the place of detention designated by the court * * *. In every such case the officer taking such child into custody shall immediately report the fact to the court and the case shall proceed as provided in Sections 2151.01 to 2151.54, inclusive, of the Revised Code."

The proceeding undertaken by the officers as herein set forth was a far cry from anything permitted as provided for in these sections.

Article I, Section 10 of the Constitution of Ohio provides:

"No person shall be compelled, in any criminal case, to be a witness against himself."

The Fifth Amendment of the Constitution of the United States provides:

"* * * nor shall [any person] be compelled in any criminal case, to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law."

The Sixth Amendment to the Constitution of the United States provides that the accused shall have the right "to have the assistance of counsel for his defense."

The Fourteenth Amendment to the Constitution of the United States provides:

"* * * No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law."

In the case of *State* v. *Stewart*, 176 Ohio St. 156, the Supreme Court of Ohio held:

"A person who is less than 18 years old is not legally incapable of making a voluntary confession."

In that case Stewart testified himself that he had confessed voluntarily. Stewart's testimony was:

"And so we talked for a while and they asked me if at that time I would care to give a formal statement. And I said, 'Yes, I would,' because I wanted to get this over with. I wanted to be all through, I didn't want to have anything—I wanted to get it off my chest for good.

"And so we had a conversation before they took the statement, it was mostly between Mr. Pappas and myself. He told me that I didn't have to give this. He said 'It will be of your own free will.' But I did want to give it then. I did, like I said before, want to get it off my chest."

It is not difficult to distinguish why the foregoing statement of Stewart was voluntary and the statement of John Carder in the instant case was not. The distinction is obvious. The instant case compares more nearly with the case of *Haley* v. *Ohio*, 332 U. S. 596. Also see *Escobedo* v. *Illinois*, 378 U. S. 478, in which accused was an adult.

In the instant case during the inquisition John Carder had become the accused and the purpose was to get him to confess his guilt despite his constitutional right not to do so.

During trial he need not take the witness stand, but if he does, it is in open court where he has counsel and where his parents and the public are privileged to be present to know of the manner in which he is treated and inquired of.

This is not a case of statements voluntarily made by Carder as were those in the case of Stewart. Rather, this is a case of statements obtained from a child by cross-examination in a secret inquisition from which his parents and attorney were barred; and of which the Juvenile Court had not been advised,

although the officers were aware of his age and it was at a time when the Juvenile Court was open and nearby.

As a result of this secret inquisition six or seven officers who heard his answers, which he had not been advised could be used against him, and which were given under circumstances in which a 16 year old boy would not have been aware of his rights, took the witness stand in turn to re-iterate over and over to the jury what had been said, until the record discloses the extent to which his conviction became dependent upon what had occurred at the secret inquisition.

The syllabus written with the majority opinion states that confessions or admissions are admissible in evidence '' (4) where there is no showing that the confession was obtained by inquisitorial processes.'' I think the syllabus states good law, but I cannot see how the facts of this case can possibly be found to come within its provisions.

In the case of *Gallegos* v. *Colorado*, 370 U. S. 49, 8 L. Ed. 325, 82 S. Ct. 1209, headnotes appearing in 82 S. Ct. read:

''1. Due process condemns obtaining of confession by secret inquisitorial processes, such as are conducive to use of physical or psychological pressures, since due process both requires procedural safeguards and condemns compulsion.

''2. Forfeiture of lives, liberty or property of people accused of crime can only follow if procedural safeguards of due process have been obeyed.''

In its opinion the court said that we must look at the totality of circumstances.

Without consultation with his parents or his attorney, or without being taken before Juvenile Court as provided for by statute for protection of his rights, it is my finding that John Carder, age 16, while being faced with a battery of law enforcement officers, was not able to know, let alone assert, such constitutional rights as he had.

Further, for a minor to make a voluntary statement is one thing, but to deprive him of his rights as a juvenile and to proceed in a manner which the juvenile statutes have been enacted to prohibit, especially at 9:00 a. m. on a Tuesday when the court is close at hand and open, cannot, in my opinion, be held to have afforded to John Carder due process of law.

Section 2151.35, Revised Code, also provides that any evi-

dence given in the Juvenile Court shall not be admissible as evidence against the child in any other case or proceeding in any other court. I fail to see how an exception to the statute can be made as to evidence obtained by a juvenile probation officer at a secret inquisition held in violation of the provisions of the juvenile code. If evidence obtained at a sanctioned hearing is not admissible, how can that obtained at an unsanctioned hearing be held admissible.

It is my finding that the second story told by John Carder at the secret inquisition while his parents and attorney were denied the right to speak to him and without the Juvenile Court being advised was obtained in violation of his constitutional rights and under such circumstances that it cannot be found to have been voluntary, as a matter of law. It was the only story in which he made any admission of the murder of Vanetta Brucker, which at the trial he denied, and it may have materially influenced the jury in arriving at a verdict. The admission of this second story and of that testimony thereafter founded upon it was error prejudicial to the defendant, which prevented him from having a fair trial and deprived him of his constitutional rights.

It is important that whoever murdered Vanetta Brucker be convicted. Whether John Carder was innocent or guilty I have not determined. Under government by law John Carder and all others alike are entitled to equal rights of due process. Under our laws as established by the Constitution of the United States, of the state of Ohio and the statutes of Ohio relating to proceedings against juveniles, we cannot condone what happened at the inquisition of John Carder either as applicable to him or as it would likewise, if applicable to him, be applicable to any other 16-year-old child under similar circumstances.

For the reasons herein stated the judgment and sentence entered upon the jury verdict ought to be reversed and this case should be remanded to the Common Pleas Court for a new trial and further proceedings according to law.