419 P.2d 219

**STATE of New Mexico, Plaintiff-Appellee,**

**v.**

**Tobias ORTEGA and Raymond Patterson, Defendants-Appellants.**

**No. 7976.**

Supreme Court of New Mexico.

Sept. 6, 1966.

Rehearing Denied Oct. 25, 1966.

8.

Jack A. Smith, Albuquerque, Dean S. Zinn, Santa Fe, for appellants.

Boston E. Witt, Atty. Gen., Roy G. Hill, Gary O. O'Dowd, Asst. Attys. Gen., Santa Fe, for appellee.

## OPINION

MOISE, Justice.

On October 16, 1961, Lucille Bruce was killed by a gunshot wound in the chest. Appellant Tobias Ortega was convicted of murder in the first degree and appellant Raymond Patterson was convicted of murder in the second degree for her killing.

Seven points relied on for reversal are presented, only two of which apply to both defendant Patterson and defendant Ortega. These points will be considered first, followed by discussion of the remaining five points which relate to defendant Ortega only.

The first point claims error by the trial court in admitting certain statements or confessions made by appellants after they had been taken into custody.

The facts material to a consideration of this point are that at the time of the homicide, arrest and taking of statements, appellant Patterson was not quite sixteen years old, and was under commitment to the State Hospital for the insane from which he had escaped two days preceding his arrest. (No issue as to his sanity is presented on this appeal). He was picked up by police at about 9:30 P.M., at which time he smelled of alcohol, was staggering and "woozy." He was taken to the police station, placed in the drunk tank, his outer clothes taken away, whereupon he was questioned by a police officer for 30 minutes to an hour and stated that he had done the shooting. He was then taken to the hospital for an examination which consumed more than an hour, after which he was returned to the police station and placed in the office of the commanding officer where he was questioned by two officers and gave a written statement which was taken about 2:15 A.M. and completed at about 3:00 A.M. One of the officers said that before taking the statement Patterson was handed a sheet of paper where were stated a party's constitutional rights not to make a statement; that any statement made could be used against him in a trial; that he was entitled to an attorney; and, in addition, set forth that the statement was given freely and voluntarily and without threats or promises. The other officer stated that explanation of his constitutional rights was read to Patterson and was then handed to him to be read. Without going into the details of the offense as shown in the statement, it discloses that Patterson stated he drank two cans of beer and half a quart bottle of whiskey before the shooting which he then stated had been done by Ortega.

Insofar as appellant Ortega is concerned, it appears that he was 17 years old. He was taken into custody at about 3:30 A.M. on October 17, 1961, and was taken to the police station where questioning began immediately by one officer with another present, and continued until 6:05 A.M., at which time a written statement was taken. When taken into custody it appeared he had been drinking and, as stated by one of the officers, he was in "bad shape." He stated he had taken some "yellow jacket" pills and had smoked a marijuana cigarette. However, the officers testified that defendant Ortega appeared to be normal when the statement was taken three hours later. Before the statement was reduced to writing, one of the officers read to him from the form concerning defendant's constitutional rights and then handed the form to the defendant to read. Most of the questioning and answers were in the Spanish language but part was in English. The defendant and the interrogator understood both lan-

guages. The statement by Ortega differed in details from that given by Patterson, but contained an admission by him that he had fired the fatal shot.

At 8:00 A.M. the defendants were together in a room with the Santa Fe Chief of Police, the district attorney, two police officers, and a court reporter. After having their constitutional rights explained to them, they were interrogated about what occurred the day before, and they recounted their movements and the happenings at the time of the shooting. Notes of the entire proceedings were taken by the court reporter and recounted by him on the witness stand from memory.

At about 11:00 A.M., the morning of October 17, both defendants were taken to the scene of the murder where the occurrences of the day before were reenacted and explained by them. Before leaving the police station they were advised that they had to go voluntarily, but none of their other rights were mentioned. At the scene of the reenactment there were several policemen and police cars. Questions were asked and responses given. Most of the questioning and answering was in Spanish, although some English was also used.

Objection was duly made at the trial to the introduction of the written statements, to the testimony of the court reporter concerning what transpired at the session where he took notes, and to the testimony concerning what was said and done at the scene of the crime when the defendants were taken there to reenact what had occurred. The principal ground for objection was that no proper foundation had been laid demonstrating that the statements and conduct of the defendants were voluntary, and that the constitutional rights of the defendants were infringed in connection therewith.

Understandably great reliance was placed in the briefs on Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed. 2d 977, where certain rules applicable to confessions are announced. However, that decision was announced long after the trial in this case which occurred in July and August, 1963, and it has since been determined, in Johnson v. State of New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882, that the rule promulgated in Escobedo should not be applied retroactively, and would not apply in trials commenced prior to June 22, 1964. Accordingly, defendants may not rely on that case.

We are impressed that the procedure followed here conforms to the rules approved in Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908, 1 A.L.R.3d 1205. In connection with each of the three items of proof, i. e., the confessions, the joint statement and the reenactment of the crime, the state was required to lay a foundation before they were submitted to the jury. Based upon the presentation made to the court, a ruling was made that the evidence was admissible, whereupon the proof

establishing the foundation as well as the facts constituting the admissions were repeated to the jury which was instructed specifically to the effect that the burden of proof of the voluntary character of confessions was upon the state and that, if the jury were not satisfied as to their voluntary character, they should be disregarded. Also, they were advised that in determining whether the statements were voluntary, the following circumstances should be considered:

"(1) The length of time the defendants were questioned and the circumstances surrounding such questioning.

(2) Whether or not defendants were in the custody of persons in authority and the alleged confessions were elicited by policemen or other persons in authority.

(3) Whether or not defendants were duly cautioned as to their constitutional rights on the subject before they made any self-incriminating confessions; and in this connection you are instructed that mere recitals at the head of a written statement which merely formalize constitutional requirements are meaningless unless it is shown that the defendants knew and understood them.

(4) The nature and condition of the quarters where defendants were kept while being questioned.

(5) The time of day when the questioning began and when it ended, and the treatment accorded the defendants in between.

(6) Whether or not the defendants, and each of them, were in full possession of their mental faculties at the time the confessions were made, and in this connection you are to consider whether or not they were under the influence of intoxicants or drugs or both to such an extent that they did not fully realize what they were doing or the enormity of their acts.

(7) The age and education of the defendants at the time the purported confessions were taken.

(8) That the defendants were in police custody without an attorney, a member of their families or anyone else to aid or advise them."

As stated above, this procedure accords with the holding in Jackson v. Denno, supra. See also, Pece v. Cox, 74 N.M. 591, 396 P.2d 422; State v. Armijo, 64 N.M. 431, 329 P.2d 785.

■■ Appellants do not claim error in the instructions, or that the procedure was not proper. Rather, if we understand their position correctly, it is more nearly that the "totality of circumstances" requires a conclusion that appellants' constitutional rights were violated by the procedure followed in eliciting the confessions and accordingly the proof was not admissible. In this connection, they point primarily to the youth of the appellants, the fact they still showed the ef-

fects of liquor and possibly other stimulants when they first confessed, and that they were not furnished counsel or turned over to the juvenile authorities.

In Gallegos v. State of Colorado, 370 U. S. 49, 82 S.Ct. 1209, 1213, 8 L.Ed.2d 325, 87 A.L.R.2d 614, being a case involving the question of the voluntary character of a confession by a fourteen-year-old boy, the court said that in determining whether or not the voluntary character of a confession in conformity with our constitutional requirements had been established in any given case required "close scrutiny" of the facts in individual cases. Further, that illustrative of circumstances to be considered were the length of questioning, the use of fear, as well as the youth of the accused. In the particular case the court, with four justices concurring and three dissenting, concluded the confession was not voluntary.

We quote the majority's statement:

"There is no guide to the decision of cases such as this, except the totality of circumstances that bear on the two factors we have mentioned. The youth of the petitioner, the long detention, the failure to send for his parents, the failure immediately to bring him before the judge of the Juvenile Court, the failure to see to it that he had the advice of a lawyer or friend—all these combine to make us conclude that the formal confession on which this conviction may have rested (see Payne v. [State of] Arkansas, 356

U.S. 560, 568, 78 S.Ct. 844, 2 L.Ed.2d 975, [981], was obtained in violation of due process."

We are thus called upon to determine if the "totality of circumstances" here requires a similar result, or if the facts presented by this appeal indicate a contrary outcome. In this connection we note that there was no long detention. The parents were not advised, nor were the defendants immediately turned over to the juvenile authorities, or provided legal counsel. Notwithstanding these facts, and the further ones of the drinking and general physical conditions at the time of arrest, we are impressed that we cannot say as a matter of law that the ruling of the trial judge and the finding of the jury lack support in the evidence. It is not for us to pass upon credibility. Rather, we must "accept the determination of the triers of fact, unless it is so lacking in support in the evidence that to give it effect would work that fundamental unfairness which is at war with due process." Lisenba v. People of State of California, 314 U.S. 219, 238, 62 S.Ct. 280, 291, 86 L.Ed. 166, 181.

In this connection, we note that the record does not contain a single word indicating that either of the defendants was threatened in any manner, or cajoled or promised anything whatsoever to make a statement. Rather, it appears that both of them being of Spanish descent and speaking and understanding both Spanish and English, all of

the questioning was by police officers who were likewise of Spanish descent and able to converse in either Spanish or English, and nothing is evident except routine questioning in ordinary course of an investigation of a crime without psychological, punitive or tricky overtones. Neither do we find in the evidence any suggestion that because of the alcohol or pills consumed, or for any other cause, the defendants' wills were in any sense overborne, or their statements thereby made of questionable veracity. To the contrary, there is no conflict in the evidence, and the proof clearly sustains a conclusion that the standards governing the admissibility of confessions into evidence, recognized and announced in Townsend v. Sain, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770, were amply met.

As regards the youth of the defendants, we subscribe to the rule that minority alone is not enough to require a conclusion that confessions are involuntary and inadmissible, but rather that the age of the defendants is a factor to be considered when appraising the character of the confessions as voluntary or not. See Anno. 87 A.L.R.2d 624; Bean v. State, 234 Md. 432, 199 A.2d 773. This was clearly explained to the jury in the instructions given by the court concerning the various statements and confessions.

That defendants were not forthwith delivered to the juvenile authorities we do not consider to be a fatal defect in the confessions. Our statute differs materially from the Arizona statute construed in State v. Shaw, 93 Ariz. 40, 378 P.2d 487, where "forthwith" notification of the probation officer of the arrest of a minor is required. Because this had not been done when a confession was obtained in State v. Shaw, supra, it was held that it was reversible error to receive the confession in evidence. However, it was stated in the decision that admissibility of admissions made during detention when the statute was not being violated was to be tested by the same rules applied to other evidence. Our statute, § 13–8–42, N.M.S.A.1953, provides that upon arrest, a juvenile defendant's "parents, guardian or custodian shall be notified at the earliest possible time" and, further, "shall immediately notify the probation officer or juvenile attorney, and shall file a written report of the arrest and his actions, with the probation officer or juvenile attorney." § 13–8–43, N.M.S.A.1953, provides that if a juvenile is not released as provided in § 13–8–42, supra, he is to be taken "without unnecessary delay" to the probation officer or other place provided for detention of juveniles, and the detention is to be reported to the probation officer "as soon as possible thereafter," with a proviso that "no juvenile shall be held in detention longer than forty-eight [48] hours, unless upon order of the court." § 13–8–44, N.M.S.A.1953, states that "[w]henever reasonable, no juvenile

shall at any time be unduly detained in any lockup or jail," with certain exceptions.

From the foregoing it is plain that under certain circumstances detention of juveniles by police for periods not exceeding 48 hours is permitted under our law. Our attention has not been directed to any proof of violation of the noted sections of the juvenile code. Compare, State v. Carder, 3 Ohio App.2d 381, 210 N.E.2d 714.

██ We cannot close the discussion on this point without noticing Harling v. United States (1961), 111 U.S.App.D.C. 174, 295 F.2d 161, wherein the District of Columbia juvenile court statute was held to make inadmissible confessions obtained by police while minor defendants were in custody of the juvenile court. The decision was based on a view held by the court that to rule otherwise would result in juveniles being at a greater disadvantage than adults, where due process violation entered into the picture, by virtue of the fact that as juveniles in juvenile court they had none of the constitutional protections which surround criminal proceedings. Compare what we said in In re Santillanes, 47 N.M. 140, 138 P.2d 503. While we readily admit that there may be cases wherein confessions were elicited as part of the juvenile court procedure, see 79 Harvard L.R. 775, 790, whereby the argument made in Harling v. United States, supra, would have merit, we fail to see how the fact that defendants here were technically in custody of the ju-

venile court, could have affected the voluntary character of the statements made. No one has suggested that they thought they were confessing as juveniles or to improve their position with the police or juvenile authorities. To the contrary, they were advised of their rights guaranteed in criminal proceedings without any qualifications concerning age or representations with regard to rights to be treated as juveniles. We do not perceive that if any illegality was present because the confessions were taken while the defendants were technically in the custody of the juvenile court, that such fact taints the confessions to such an extent as to make them involuntary or to make their use "fundamentally unfair." We certainly agree that use of a confession obtained from a minor, when one obtained from an adult under similar circumstances would not be admissible, would be grossly unfair and could not be justified on any theory. This was the situation considered in Harling v. United States, supra. See, Edwards v. United States (1964), 117 U.S.App.D.C. 383, 330 F.2d 849. Here, however, the fact that the defendants were in the custody of the juvenile court because § 13–8–42, N.M.S.A. 1953, so provided, in our view does not require a conclusion that the confessions were "tainted," but to the contrary, we find no connection or relationship, one to the other. Under the circumstances, no special considerations require exclusion of the proof. This is not a case of "exploitation" of the "primary illegality" held improper in Wong

Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441. Nor does the rule of Nardone v. United States, 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307, require a contrary result.

It follows from what has been said that we find in the facts disclosed by the record here no reason to depart from the uniform holdings of courts in this country that whereas the age of minor defendant is an important factor to be considered when passing on the question of voluntariness of an offered confession, the fact of minority alone does not require a conclusion that a confession was not voluntary. Anno. 87 A. L.R.2d 624. Appellants' first point is found to be without merit.

We next consider whether the court erred in not sustaining defendants' motions to dismiss the charges as to felony murder, first degree murder, and second degree murder.

Section 40-24-4, N.M.S.A.1953, in effect when the homicide here involved took place, but since repealed, read as follows:

"All murders which shall be perpetrated by means of poison or lying in wait, torture, or by any kind of wilful, deliberate and premeditated killing, or which is committed in the perpetration of or attempt to perpetrate any felony, or perpetrated from a deliberate and premeditated design unlawfully and maliciously to effect the death of any human being, or perpetrated by any act greatly dangerous to the lives of others, and indicating a depraved mind regardless of human life, shall be deemed murder in the first degree; and all other kinds of murder shall be deemed murder in the second degree."

A reading of the section discloses no degree of murder denominated "felony murder." Rather, murder "which is committed in the perpetration of or attempt to perpetrate a felony" is "first degree murder." In addition, one who commits murder in certain other specified ways and circumstances is guilty of murder in the first degree.

To resolve the point here raised, we must determine if the record discloses substantial evidence to support the charges and, if it does, there was no error in overruling the motion. State v. Mosley, 75 N.M. 348, 404 P.2d 304; State v. Tipton, 57 N.M. 681, 262 P.2d 378; State v. Martin, 53 N.M. 413, 209 P.2d 525. Insofar as "felony" murder is concerned, it should be sufficient answer to defendants' position to note the evidence of efforts to enter if not to steal decedent's car and to rob decedent while armed, without in any way considering any sexual molestation which may have transpired after her death. Murder committed either in connection with car theft or armed robbery would be murder committed in the perpetration or attempt to perpetrate a felony and would be first degree murder. Insofar as second degree

murder is concerned, we need only point to State v. Kappel, 53 N.M. 181, 186, 204 P.2d 443, 446, where it was stated:

"* * * [U]nless we have a case where the very means employed in committing a homicide, as by torture, poison, or lying in wait (1941 Comp., § 41–2404) supply proof of the deliberation, the intensified malice, necessary to raise the grade of the offense to first degree as a matter of law; or unless it be one committed in the perpetration of, or attempt to perpetrate, a felony (Id., § 41–2404) where by legislative fiat the circumstances under which the killing occurred render conclusive the presence of such deliberation, it is always necessary to submit second degree and thus permit the jury to say whether it is the one or the other—first or second degree."

Defendant Patterson asserts that since his statement placed him behind a bush some distance from Ortega when the shot was fired, the state is bound by this exculpatory statement and he could not be guilty of first or second degree murder, either as a principal or as an aider and abettor.

▇▇▇▇ The facts and circumstances in evidence which implicate defendant Patterson are amply sufficient to overcome his exculpatory statement under the rules stated above. In order for him to be guilty as an aider and abettor, all that was necessary was that he share the criminal intent of defendant Ortega and that a community of

purpose and partnership in the unlawful undertaking be present. State v. Ochoa, 41 N.M. 589, 599, 72 P.2d 609. See also, State v. Lord, 42 N.M. 638, 84 P.2d 80. The record discloses that there was substantial evidence from which the jury could conclude that defendant Patterson and defendant Ortega had a community of purpose to steal decedent's car and rob her at gunpoint, including shooting her if circumstances required. Even though Patterson may have been occupied some distance from Ortega when the trigger was actually pulled, the necessary participation to make Patterson an aider and abettor is not necessarily absent. This unity of purpose could be inferred from conduct of the parties after the shooting as, for example, their continued activities seeking the car keys, taking money from decedent's purse, sexually molesting her, as well as firing at her dogs. These activities would similarly be sufficient to overcome the effect of Patterson's exculpatory statements concerning his whereabouts at the time of the shooting. State v. Garcia, 57 N.M. 665, 262 P.2d 233; State v. Casaus, 73 N.M. 152, 386 P.2d 246. See also, State v. Mosley, supra.

The latter case also supplies the answer to defendants' assertion that there was a fatal variance between the charges and the proof. See also, § 41–6–37, N.M.S.A. 1953.

The next three points in the brief apply only to defendant Ortega, and raise the issue first of where the burden of proof lay

to establish that defendant was too unsound mentally to stand trial and, secondly, whether the court erred in failing to rule as a matter of law that defendant Ortega was incapacitated mentally to stand trial.

Our statute, § 41–13–3, N.M.S.A. 1953, provides that a person who is insane or mentally disordered at the time of arraignment or trial shall not be required to plead or stand trial. State v. Folk, 56 N.M. 583, 247 P.2d 165. In State v. Upton, 60 N.M. 205, 211, 290 P.2d 440, 443, we stated the test to be, "Has the defendant capacity to understand the nature and object of the proceedings against him, to comprehend his own condition in reference to such proceedings, and to make a rational defense?" The court went further and stated that this meant that the lack of capacity and comprehension must result from present insanity.

In the instant case, the court held two hearings prior to trial at which the defendant Ortega's competency to stand trial was the issue. After hearing medical testimony the court, on June 25, 1963, ruled him fit for trial. However, he was ordered returned to the State Hospital for further testing, examination, observation and treatment. On July 26, 1963, being immediately before commencement of the trial on July 31, 1963, another hearing was held where medical testimony was again presented and after which the court made the following determination:

"1. Although Tobias Ortega may suffer from some present disease of the mind, that he

(a) Has the present capacity to understand the nature and object of the homicide proceedings against him; and

(b) Has the present capacity to comprehend his own condition in reference to such proceedings; and

(c) Has the present capacity to make a rational defense in such homicide proceedings."

During the trial that followed, the question of whether Ortega's condition was such as disqualified him to stand trial was again raised. Thereupon, the court permitted proof before the jury of the defendant's mental condition and in addition to having the jury pass upon his guilt or innocence, also had them find if, as a result of a present existing disease of the mind, defendant had "the present capacity to understand the nature and object of the homicide proceedings pending against him;" and " * * * to comprehend his own condition in reference to such homicide proceedings," and if he had "the present capacity to make a rational defense to the charge of homicide pending against him." All the questions were answered in the affirmative.

There can be no question that the procedure followed is in conformity with what was said in State v. Upton, supra:

"Section 41–13–3, NMSA 1953, as construed in Territory v. Kennedy, cited supra, [15 N.M. 556, 110 P. 854], and State v. Folk, cited supra [56 N.M. 583, 247 P.2d 165], outlines the rights of defendants claiming insanity at the time of trial:

1.) No particular method of bringing the question of defendant's present sanity to the attention of the trial court is required. 2.) Once the issue has been raised the trial court is under a duty to inquire into the matter. 3.) The trial court must rule as to whether a reasonable doubt exists as to the sanity of the accused. 4.) If the trial court rules affirmatively the issue must be submitted to the jury for determination."

What we have said still does not reach the issue of burden of proof. The court instructed the jury that defendant was presumed sane, which presumption could be rebutted and overcome, and that defendant Ortega had the burden of proving "by a preponderance of the evidence that he is [was] too unsound mentally to be tried at this time." This was followed by a definition of "preponderance of the evidence."

As long ago as 1918, in the case of In re Smith, 25 N.M. 48, 176 P. 819, 3 A.L.R. 83, the rule in effect in California that the burden of proof was on a defendant to establish insanity by a preponderance of the evidence as set forth in People v. Lawson, 178 Cal. 722, 174 P. 885, was applied in

arriving at a determination of whether the petitioner in that case was insane to an extent that would prevent carrying out the penalty decreed at the trial. Although the proceedings there were under a different statute from that invoked here we perceive of no reason for application of a different rule. As a matter of fact the rule as announced is in accord with Professor Weihofen's statement in his authoritative book, Mental Disorder as a Criminal Defense, p. 434, that, "The burden of proof, when present insanity is alleged as a ground for preventing trial, sentence, or execution, is generally said to be upon the defendant, to prove by a preponderance of evidence that he is too unsound mentally to be tried, sentenced, or executed, as the case may be." That possibly two states and the federal courts apply a different rule does not convince us there is anything basically improper in the requirement. No question of guilt or innocence or the proof of charges of criminal conduct are involved—only mental condition to stand trial. The point is without merit.

We next consider whether the evidence was such as to require a finding of present insanity so as to compel the postponement of trial, or, stated otherwise, was there substantial evidence to support the jury's conclusion that defendant, under the rules set forth above, was not so disordered in his mind as to permit him to be tried? Defendant asserts that all the relevant medical

testimony requires a conclusion that he was not mentally able to stand trial and, accordingly, it was error for the court to rule otherwise.

In so arguing, defendant loses track of an important consideration. There was testimony from laymen who had observed defendant's conduct which, under rules almost universally applied, may be received on the question of sanity. Weihofen, Mental Disorder as a Criminal Defense, p. 301. See also, Territory v. McNabb, 16 N. M. 625, 120 P. 907; Anno. 72 A.L.R. 579. We are satisfied that under the rules as announced in State v. Folk, supra, and State v. Upton, supra, there was no error in the court's refusal to direct a verdict that defendant Ortega was incapacitated to stand trial.

Finally, defendant Ortega argues that the court erred in refusing to submit voluntary manslaughter as an included offense for which he could have been convicted under the evidence. One version of what transpired at the time of the shooting was to the effect that during a conversation between decedent and the defendants, defendant Ortega told decedent to keep quiet, whereupon she threw a dog she was carrying at him, and he thereupon shot her. It is defendant's position that by the act of throwing the dog defendant was provoked so as to excite certain emotions or reactions whereby the resultant homicide would be voluntary manslaughter.

Section 40–24–7, N.M.S.A.1953, as it read at the time of the instant killing, stated: "Manslaughter is the unlawful killing of a human being without malice. * * * 1st. Voluntary: Upon a sudden quarrel or in the heat of passion. * * *"

While we fully recognize the rule to be that where there is evidence presented which supports a defendant's theory of his defense which, if proved, would require acquittal, or reduction in the degree of crime, it is error to refuse to instruct on such position, State v. Padilla, 66 N.M. 289, 347 P.2d 312, 78 A.L.R.2d 908; State v. Sanders, 54 N.M. 369, 225 P.2d 150, we do not see in the proof referred to above any possible basis for a conclusion that defendant Ortega was thereby sufficiently provoked to excite the emotions, whereby a killing of possible higher degree would be reduced to voluntary manslaughter. There is nothing whatsoever in any of the evidence adduced which remotely suggests such a result. Compare State v. Kidd, 24 N.M. 572, 175 P. 772. It was not error to refuse to instruct on voluntary manslaughter.

Note should be taken of the fact that counsel for defendants served both in the trial court and in this court by appointment because of the indigency of the defendants. Counsel are to be complimented for their efforts on behalf of defendants, both in the trial and on this appeal.

Having considered each of appellants' arguments and having concluded that re-

versible error has not been demonstrated, the judgments and sentences appealed from should be affirmed.

It is so ordered.

CHAVEZ, NOBLE, and COMPTON, JJ., concur.