Michael Kern, J.
In this robbery prosecution, the pretrial hearing initiated by the motion to preclude challenges the admissibility of a statement claimed to have been made by the defendant, a police officer, who contends that the interrogation which *838 elicited the statement was obtained in violation of his constitutional rights under the Fifth Amendment. He urges that, within the meaning of Miranda v. Arizona (384 U. S. 436), his interrogation by police officers took place while he was in custody or otherwise deprived of his freedom of action in a significant way; that he was the target of the inquiry which was focused upon him as evidenced by the fact that a confrontation between him and a witness took place after the termination of such interrogation, intended to produce an identification; that he was led to believe, as a reasonable person, that he was being deprived or restricted of his freedom of action or movement; that, accordingly, the failure to proffer the advice and warnings mandated under such circumstances by the Supreme Court of the United States precludes the submission of his statement to a trial jury. The prosecution, in support of its contention that the statement is admissible into evidence, urges that the defendant was neither in custody nor otherwise deprived of his freedom of action in any significant way; that the statement was incidental to the traditional functioning of police officers engaged in the investigation of crime and was, in fact, made during routine investigation into the highly unusual circumstances that an automoble registered in the name of a police officer was said to have been used as the get-away car following an armed robbery that, at the time of such interrogation, there was no evidence whatever implicating the defendant himself as one of the perpetrators of the crime; that the defendant, in the totality of all the circumstances, was not led to believe, as a reasonable man, that his freedom of action was restrained; that, in fact, he was not arrested and charged with the crime until approximately six months thereafter.
It appears from the testimony at the hearing, just concluded, and I find as fact, for the purpose of this motion, that during the morning of August 27, 1965, one Baker had observed an automobile at the scene of a holdup, the perpetrators of the crime entering before it was driven away immediately thereafter by a person wearing a shirt of a particular type and color. The license plate number given by him to the police was followed by the disclosure, upon investigation within a few minutes, that the automobile was registered in the name of the defendant, a police officer. High ranking police officials, disturbed by so unusual a situation, and knowing that the defendant was on vacation, questioned him about three hours later, when he called at the station house for his pay check, in an effort to determine whether his automobile had been stolen or used without his knowledge or if it had been, in fact, in his posses *839 sion. The interrogation was confined to the subject of the whereabouts, possession and control of the defendant’s automobile during the morning hours. Reference by the investigators to the fact that the crime of robbery had been committed served only to emphasize the need for, rather than the focal point of the inquiry. There was no effort to extract a confession from the defendant or even an admission which, without other evidence, would place the defendant in an untenable position requiring further explanation.
The inquiry never reached the accusatorial stage. Only after its termination did suspicion begin to attach to the defendant, who had made no claim that the vehicle had been stolen or used without his knowledge. The automobile was impounded and the defendant was assigned to clerical duty. He was not arrested nor was he detained against his will at any time that day or during the period of approximately six months following such interrogation. The investigating officers testified that there was no evidence linking the defendant to the commission of the crime until an alleged accomplice, months later, supplied the information upon which the prosecution now rests its case.
It was at this point which terminated the defendant’s interrogation, no inquiry having been made to learn whether or not the defendant had participated in the commission of the crime, that further proceedings along investigative lines were to be halted until the defendant was fully advised of his rights, for suspicion had then attached. This was the bench mark from which one interrogation objective would lead to another. If there were to be continued questioning, the Miranda standards would have had to be applied. The fact that there was no inquiry of the defendant intended to exact information as to his presence at the scene of the holdup, as to time elapses in his movements, as to his wearing apparel, his associates or his finances, lends force to the conclusion that his mind could not have fastened, as a reasonable man, upon the thought that he was being physically deprived of his freedom of action.
In the Miranda case (384 U. S. 436, 477, supra), the court said: ' ‘ The principles announced today deal with the protection which must be given to the privilege against self-incrimination when the individual is first subjected to police interrogation while in custody at the station or otherwise deprived of his freedom of action in any way. It is at this point that our adversary system of criminal proceedings commences, distinguishing itself at the outset from the inquisitorial system recognized in some countries. Under the system of warnings *840 we delineate today or under any other system which may be devised and found effective, the safeguards to be erected about the privilege must come into play at this point.”
In the drastic departure from long recognized procedures surrounding interrogation, the Miranda decision defined ‘ ‘ custodial interrogation ” as “ questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.” This definition has given rise to a multitude of constructions and interpretations. However, in the recent case of People v. Rodney P. (Anonymous), 21 N Y 2d 1, our Court of Appeals, in giving approval to the holding of the California Supreme Court in People v. Arnold (66 Cal. 2d 438 [1967]) seems to have added a new dimension to the meaning of “ custodial interrogation, ’ ’ viz, 4 ‘ custody ’ ’ by virtue of such a state of mind of theperson interrogated as would give rise to a belief by a reasonable person that he was being deprived of freedom of action. The California court, after quoting the Miranda definition, added (p. 448);
“We hold that custody occurs if the suspect is physically deprived of his freedom of action in any significant way or is led to believe, as a reasonable person, that he is so deprived.”
In the Rodney P. case (supra), the court pointed out that the defendant neither knew nor was advised that his accomplice was already in custody or had implicated him. Notwithstanding he was pointedly questioned “about * * * taking a car from around the vicinity of the New Hyde Park ” (p. 10) the statement was held to be admissible.
There was, in the instant case, no physical deprivation of the defendant’s freedom of action. As a police officer, it is difficult to conclude that he believed himself to be so deprived. .Such events as may have engendered such a belief, as the confrontation with the witness Baker, took place after the defendant’s statement had been concluded. There was not, during the defendant’s questioning, any intimation that he was a suspect.
It must be recalled that the Miranda mandates Avere prompted by and had their origin in the inquisitorial and often unjust methods of interrogating suspects in the menacing and foreboding atmosphere of the police station.
The defendant, an experienced police officer, trained to investigate and interrogate, as much at home in the station house environment as would be the private citizen in his own home, is not to be considered as one who would be ordinarily susceptible to the type of browbeating inquisitions unfortunate examples of Avhich, in large measure, prompted the Miranda safeguards. *841 The station house squad room, always frequented by police officers, was, in a manner of speaking, the natural habitat of the defendant. The fears, the terrors and the tensions which undoubtedly possess the mind of the lay suspect when called upon to submit to interrogation in the police station, are entirely foreign to the precinct police officer.
Upon all the testimony appearing in the record, the court is satisfied beyond a reasonable doubt that the defendant’s statement, made under circumstances not likely to affect substantially his ‘ ‘ will to resist and compel him to speak where he would not otherwise do so freely ’ ’ was freely and voluntarily made.