471 P.2d 553

**STATE of Idaho, Plaintiff-Respondent,**

v.

**Michael DILLON, Defendant-Appellant.**

**No. 10215.**

Supreme Court of Idaho.

June 25, 1970.

May, May & Bennett, Twin Falls, for defendant-appellant.

Robert M. Robson, Atty. Gen., and Howard F. Manly, Asst. Atty. Gen., Boise, and R. H. Seeley, former Pros. Attorney, Jerome County, Jerome, for plaintiff-respondent.

McQUADE, Justice.

In January, 1968, defendant-appellant, Michael Dillon, was tried for the murder of Alta Simerly, age 65. A jury found him guilty of murder in the second degree, and judgment was entered accordingly. Dillon has brought this appeal from that judgment.

The deceased, Alta Simerly, was last known to have been alive on Tuesday, March 14, 1967. The fact that she was missing had become apparent to her sister, Mrs. Virginia Deck, by late afternoon of Thursday, March 16, 1967, and Mrs. Deck then went to her sister's home to determine whether anything was amiss. There Mrs. Deck was confronted by an extraordinary scene. The walls, ceiling, and floor of her sister's kitchen were splattered with blood, and her sister and her sister's car were missing. She immediately left the victim's house to obtain help from friends and with them returned. The police were then called, and a fairly thorough investigation of the premises was conducted that evening. Further examinations of the Simerly residence were made on subsequent days.

Officer Elza Hall of the Jerome police department testified at trial as follows concerning the condition of Mrs. Simerly's house as it was originally discovered. Several sticks of wood of various sizes were found with blood on them in the kitchen. Also, several unfired, but ejected, .45 caliber bullets and a weight with a leather strap attached to it were found in the kitchen and on the back porch of the house. The testimony of officer Hall corroborated by other witnesses, established that a pair of bloody slippers were found. One slipper was in the kitchen, and the other in the living room of the house. There were orange peelings, a knife, and two coffee cups in the living room, and a third cup on the table in the kitchen. And, al-

though Mrs. Deck testified that her sister did not smoke, the police found a pipe, tobacco, and cigarette butts in ash trays in the living room and bedroom of the house.

In the early hours of the morning of March 18, the decedent's automobile was discovered on Jackson Street, two blocks from Dillon's grandmother's home, in Twin Falls. A substantial quantity of blood, but no fingerprints of value, were discovered on the car. On Sunday, March 19, 1967, Alta Simerly's badly beaten body was discovered in a sandpit near the Jerome golf course. Although she had been partially disrobed, subsequent investigations indicated that she had not been sexually molested.

Mrs. Simerly's body was then transported to Twin Falls, where an autopsy was performed on it by a pathologist, Dr. Carle. The following is a summary of his testimony concerning the condition of the victim's corpse. Mrs. Simerly had suffered a terrible beating about the head and neck. Some of the blows had actually detached skin from her skull. She also had bruises around the neck indicating that she had been manually strangled, and there were a number of bruises which were round with hexagonal marks, indicating that she had been beaten with something resembling a tire iron or lug wrench. She had eaten only a few hours before she was attacked. Her blood type was O-RHD-Positive, and her blood contained 0.036 grams per hundred ML alcohol. She had suffered substantial brain damage but it was not as extensive as the external damage to her head had indicated. She had also lost a great deal of blood, but probably not enough to have killed her very quickly. It was the doctor's opinion, therefore, that she had probably been killed as a result of manual strangulation. At no time throughout Dillon's statements does it appear that appellant mentioned manual strangulation.

On the 24th of March, 1967, appellant, then a member of a sheepshearing crew, was picked up by the authorities at a Breckenridge ranch in Twin Falls County and taken to the Twin Falls police station

to be fingerprinted. The police stated that this was done only in order to eliminate fingerprints which had been found in the decedent's automobile, because they knew that the defendant had ridden in the car some weeks prior to the murder. Testimony at the preliminary hearing indicated, however, that there were no useable fingerprints recovered from Mrs. Simerly's automobile. It was at one point suggested that the police had picked up Dillon on the 24th because the weight found in the victim's house and suspected to have been a murder weapon was a device thought to be used by sheepshearing crews of the sort with which appellant worked. The authorities also had information that Dillon had appeared at his grandmother's house in Twin Falls on Wednesday, March 15, 1967, wearing shoes and socks which were covered with blood. When the police asked appellant about this occurrence while at the Twin Falls police station on the 24th, Dillon responded that the blood was the result of his having been assigned to "tromp wool." Thus, he claimed, the blood was sheep blood. Although the socks had already been washed, the shoes were still stained, and the police asked Dillon if they might have the shoes for examination. Appellant, in his testimony at a preliminary hearing, indicated that he was well aware of why the police wanted the shoes and that he freely agreed to supply the shoes to the police. The authorities and Dillon then returned to the ranch where the shoes were produced and taken by the police.

These shoes were sent off to the FBI laboratory in Washington, D.C. where it was determined that the blood on them was human blood of the same major blood type as that of appellant and his alleged victim. A telegram to this effect was received by the police in Twin Falls on March 29, 1967. A variety of policemen and sheriffs from Twin Falls, Jerome and Blaine Counties then proceeded to where the sheepshearing crew was working near Bellevue, Idaho, and there they arrested appellant late that evening.

Appellant and the police, excepting the sheriff of Blaine County, then returned to Jerome. There appellant, a seventeen year old boy, with an I.Q. in the dull-normal range, was given a formal *Miranda* warning.[1] He was also then confronted with the fact that the blood on his shoes was human blood.

At this time appellant gave the first of several statements all of which were more or less inculpatory and which ultimately led up to a confession. The first statement involved a strange man in a long dark car who committed the murder and then, several hours later, coerced appellant into helping him load the body into the victim's car whereupon the two of them drove about the Twin Falls and Jerome areas, finally dropping the body in a sandpit after which appellant was let out at the Pepsi Cola Bottling Company in Twin Falls. After telling his story, Dillon was put into an adult cell in the Jerome County jail.

The following morning appellant's mother (who, according to the police, the preceding evening they had tried to notify, but had been unable to locate) and the appellant were brought to the Jerome County Courthouse where they were both advised in great detail by the probate judge concerning appellant's rights to have counsel and to refuse to speak. The probate judge particularly stressed the gravity of the charge against appellant and the consequential importance of a decision to have or not to have counsel. Appellant and his mother there rejected, as they did several times thereafter, the offer of counsel. Appellant was then interrogated by the Jer-

ome County prosecutor, Mr. R. H. Seeley, Jerome chief of police Yingst, Jerome County sheriff Burns, and Twin Falls detective Tim Qualls. This interview was recorded on tape. The story recounted therein appears to have been approximately the same as the one told the preceding evening. Later that day Dillon was again questioned by Chief Yingst and another officer, this time without a parent accompanying him.

The following day, approximately at noon, appellant's grandmother, aunt and uncle arrived from Twin Falls and asked to be allowed to see Dillon and to talk to him. They were told that an interview would not be possible unless Chief Yingst was present. When the chief arrived, they were allowed to see Dillon. Although this interview was not taped, it is apparent that appellant repeated substantially the same story with only minor deviations. Later that same day, March 31, 1967, in the presence of his mother and stepfather, appellant told yet another story, which was also taped. In this instance, as in all the preceding interrogations, Dillon was given a formal *Miranda* warning. The story this time had changed. Appellant did not assert that he was coerced into putting the body into the trunk of the car and into dumping it into the sandpit, but he claimed that he transported the corpse and disposed of it when he panicked upon discovering it in the kitchen.

At the end of this interview, while putting away the tape recorder, detective Qualls indicated to Dillon that he did not believe the story. Qualls suggested that it

1. Miranda v. Arizona, 384 U.S. 436, 478–479, 86 S.Ct. 1602, 1630, 16 L.Ed.2d 694 (1966) :

"To summarize we hold that when an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning, the privilege against self-incrimination is jeopardized. Procedural safeguards must be employed to protect the privilege and unless other fully effective means are adopted to notify the person of his right of silence

and to assure that the exercise of the right will be scrupulously honored, the following measures are required. He must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires. Opportunity to exercise these rights must be afforded to him throughout the interrogation."

would do appellant no good to continue to tell conflicting stories and that he should either tell the truth or say nothing. Dillon responded that he would tell the truth this time. He then launched into another account which differed from the preceding stories primarily in that appellant stated that he had killed Mrs. Simerly himself. At that time Dillon's family chose to obtain an attorney for him. Dillon had not had an opportunity to communicate confidentially with a parent or other relative from the time he had been brought in from Bellevue to the end of this final confession.

In May, 1967, appellant's mother and stepfather became curious about a blue suitcase which appellant had in his bedroom in their house. They sawed the lock off of the suitcase, and found a number of items which had been burglarized from Alta Simerly's home some months before she was murdered. They also found a pistol holster and belt with .45 caliber ammunition therein. They then looked into the trunk of appellant's car and discovered a .410 shotgun which was also allegedly burglarized from Mrs. Simerly's home. Appellant's family then delivered the suitcase and shotgun to appellant's counsel. Subsequently the State moved that Dillon's attorney produce the suitcase and shotgun, and appellant, during trial, moved that such evidence be suppressed. The State's motion was granted and the appellant's later motion was denied.

## I.

■ Appellant's first three assignments of error concern the availability of experts to a defendant at State expense. Appellant first contends that the district court erred in not allowing him the services of a private investigator to "check out" numerous witnesses in the Simerly murder case.

Two statutes are pertinent to this question: I.C. § 19–861(c) [2] which provides that a defending attorney may use the same facilities as the State in order to evaluate evidence and I.C. § 19–852(a) which provides:

"A needy person who is being detained by a law enforcement officer, or who is under formal charge of having committed, or is being detained under a conviction of, a serious crime, is entitled:

\* \* \* \* \* \*

"(2) to be provided with the *necessary* services and facilities of representation (including investigation and other preparation). The attorney, services, and facilities and the court costs shall be provided at public expense to the extent that the person is, at the time the court determines *need,* unable to provide for their payment." (Emphasis supplied)

Appellant here contends that trial court ruling under I.C. § 19–861 permitting use of the same state facilities (whereby he was accorded assistance by detective Qualls of the Twin Falls police department) was restrictive, and that he should have been allowed other investigatory aid, as provided for under the statute. It appears from appellant's motion that he intended to use an investigator in order to conduct again the police investigation of the Simerly murder and burglaries. He asserted that the services of an investigator were required because of "the number of witnesses listed by the Prosecuting Attorney in the information, 53 in number." This motion was made six months prior to trial. Appellant was given access to all relevant police records, and, therefore, he knew the names of the witnesses and their general role in the case. Appellant was allowed the services of two attorneys at county expense, and, at the time of the motion, the bulk of their preparation was still before

2. " \* \* \* (c) A defending attorney is entitled to use the same state facilities for the evaluation of evidence as are available to the county prosecutor. If he considers their use impractical, the court concerned *may* authorize the use of private facilities to be paid for on court order by the county board of commissioners." (Emphasis supplied).

them. Under these circumstances, and because the motion merely stated in a conclusory fashion that the number of witnesses precluded effective preparation of counsel, the trial court's decision that appellant had not made out that an investigation was *necessary* as required by I.C. § 19–852(a) (2) was not erroneous as a matter of law.

■ Appellant also contends that the district court erred in denying him access to his medical witness, especially a psychiatric expert at the county's expense until after hearings were had concerning the admissibility of certain evidence and his "confessions." Appellant was allowed to retain a psychiatrist who conducted various tests and who testified on appellant's behalf at trial. However, prior to the district court's hearing on the admissibility of Dillon's statements, the trial court had only the report of the State Hospital South at Blackfoot, on which to base its decision. Appellant contends that this was inadequate primarily because the state hospital personnel failed to present the case which appellant desired to make. In essence, therefore, appellant contends that he had a right to a "psychiatric advocate" instead of a court appointed expert at the pre-trial hearing held to determine the admissibility of his confession as required by Jackson v. Denno.[3]

The words of then Circuit Judge now Chief Justice Warren Burger in the case of Proctor v. Harris,[4] when confronted with a similar argument, are especially appropriate for this case:

"From Appellant's posture, no psychiatrist can really 'assist' him adequately unless he agrees with Appellant's position. Stripped of its verbiage Appellant's posi-

tion is that he is entitled to a psychiatrist sufficiently sympathetic so that he will assist counsel in preparing his case favorably to his claims, and, accordingly, in structuring cross-examination of the hospital doctors so as to neutralize their testimony. Neither sound administration, basic fairness, nor constitutional standards require such course." [5]

The purpose of a Jackson v. Denno hearing is to provide a reliable and efficient fact finding process to evaluate confessions before they may be presented to the body trying guilt or innocence.[6] This purpose was served admirably in this case by the extensive hearing and lengthy report of the state hospital upon which the trial court's decision rested.

## II.

■ Appellant's fourth and sixth assignments of error raise the question of whether Dillon's bloodstained shoes and fingerprints [7] obtained on March 24, 1967, and the results of tests and comparisons made thereon, should have been admitted into evidence.

■ Appellant initially contends that the shoes were inadmissible as the "fruit" of the "poison tree" of a "custodial interrogation" made without the warning required by Miranda v. Arizona.[8] It is our opinion that the few questions asked Dillon while he was being fingerprinted on March 24th was not an "in custody interrogation" within the meaning of the *Miranda* holding. In that case the United States Supreme Court stated that its decision concerned:

"[C]ustodial interrogation, [by which] we mean questioning initiated by law en-

---

3. 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964).

4. 134 U.S.App.D.C. 109, 413 F.2d 383 (1969),

5. *Id.* 413 F.2d at 386.

6. 378 U.S., at 391–394, 84 S.Ct. 1774.

7. Fingerprints are items which are protected from unreasonable, warrantless

searches and seizures. Davis v. Mississippi, 394 U.S. 721, 89 S.Ct. 1394, 22 L. Ed.2d 676 (1969). Because we uphold the trial court's finding that appellant voluntarily consented to the search and seizure of his shoes and fingerprints, we need not consider the question of whether *Davis* is retroactive.

8. *Supra,* note 1.

forcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." [9]

By way of footnote, Chief Justice Warren explained that this was merely a restatement of the *Escobedo* [10] requirement that the investigation had focused on an accused.[11] In this case the investigation had as yet not "focused" on any single suspect. Dillon was merely one among many persons who had enjoyed some slight relationship with Mrs. Simerly and who, as a consequence, was being investigated by the police. Dillon had not been "arrested" but had, of his own volition, accompanied the police to Twin Falls. He had gone to the station house only because the exigencies of the fingerprinting process required it; when that process was completed, he was immediately returned to the Breckenridge ranch. He was not "deprived of his freedom of action in any significant way." The evil against which the *Miranda* decision was directed was lengthy interrogation, employing psychological stratagems designed to elicit inculpatory statements from criminal suspects who had not made an informed or knowing waiver of their right to remain silent and to be represented by counsel.[12] That was not the situation in this case. Dillon came to the station freely; he was not held for questioning; no devious means were used to obtain a confession from him; the only questions asked him were not designed to elicit a confession of guilt but merely to obtain his permission to test his shoes. The case was still in its investigatory and not its accusatory stage. This was not, in short, an in custody interrogation as that term was used in *Miranda*.[13]

■ Appellant also argues that the fingerprints and shoes were illegally seized because he did not consent to a search or seizure of those items. The thrust of this argument is that, in order for such a consent to have been given, Dillon should have been warned of his constitutional right to withhold his possessions from police scrutiny until the authorities had procured a valid search warrant. In State v. Oldham [14] this Court recently considered this contention that a *Miranda*-style warning must be given before a consent to a search is legitimate. There we reviewed the authorities relevant to this circumstance and concluded that a valid consent to a search and seizure may be given without such a warning. Dillon voluntarily accompanied the police to Twin Falls and voluntarily gave the shoes to them. His testimony at a preliminary hearing indicates that he did so while knowing the purpose to which the authorities would put the items they seized. Following our decision in *Oldham, supra,* we hold that appellant's fingerprints and shoes were properly allowed into evidence.

■ Appellant's fifth assignment of error concerns the admissibility of the series of statements which Dillon made after he

9. *Id.*, 384 U.S. at 444, 86 S.Ct. 1602, 1612.

10. Escobedo v. Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964).

11. 384 U.S., at 444 n. 4, 86 S.Ct., at 1612, "This is what we meant in *Escobedo* when we spoke of an investigation which had focused on an accused."

12. 384 U.S. at 449–558, 86 S.Ct. 1602.

13. *See* People v. Hill, 70 Cal.2d 678, 76 Cal.Rptr. 225, 452 P.2d 329 (1969); Commonwealth v. Fisher, 354 Mass. 549, 238 N.E.2d 525 (1968); Commonwealth v. Feldman, 432 Pa. 428, 248 A.2d 1 (1968); *see* State v. Rassmussen, 92 Idaho 731, 449 P.2d 837 (1969); People v. Williams, 56 Misc.2d 837, 290 N.Y.2d

321 (1968). Because we hold that this was not an in-custody interrogation within the meaning of *Miranda* we do not have to reach the difficult question of the "fruits of the poison tree." *See* Harrison v. United States, 392 U.S. 219, 88 S.Ct. 2008, 20 L.Ed.2d 1049 (1968); People v. Ditson, 57 Cal.2d 415, 20 Cal.Rptr. 165, 369 P.2d 714 (1962); *see generally* Pitler, "The Fruit of the Poisonous Tree" Revisited and Shepardized, 56 Cal.L.Rev. 579 (1968).

14. 92 Idaho 124, 131–132, 438 P.2d 275, 282–283 (1968); *accord* United States ex rel. Anderson v. Rundle, 274 F.Supp. 364, 370 *passim* (E.D.Pa.1967).

was arrested at Bellevue, interrogated and incarcerated in the Jerome County jail. His initial contention is that the written *Miranda* warning which was read to him during the interrogations was not adequate to allow him to knowingly waive his rights to have counsel and to remain silent.

The printed warning read to Dillon by the police and signed by him is adequate.[15] It technically covers each of the cautions demanded by *Miranda* and, therefore, is sufficient. *See* I.C. § 19–853(a) (1).

Appellant argues that the *Miranda* warning as given by the police was inadequate because he, being a seventeen year old boy of dull-normal intelligence, could not fully understand it. As we said in State v. Larsen:

"We have reviewed the decisions of the federal courts and other state courts since *Escobedo* and they are almost unanimous in their holdings that, barring exceptional circumstances, confessions, admissions or incriminating statements made by a suspect after being informed of his right to remain silent are admissible." [16]

We do not believe that this was an exceptional case. There is substantial evidence in the record from which the judge could have found that Dillon was not a bright young man, but that he did have low-normal intelligence. He was capable of comprehending what was going on about him. He could read and write and could understand instructions. The officers and the prosecuting attorney several times asked Dillon and his mother if they understood the warning and if they wanted an attorney. Each time they replied that they did understand and that they did not desire counsel. Dillon stated that he understood the meaning of the warnings and substantially explained their meaning at a pre-trial hearing. On this record we hold that the trial court's conclusions that appellant had made a knowing waiver of his rights and that the statements were admis-

15.
"WARNING
"1. You have the right to remain silent.
"2. Anything you say can and will be used against you in a court of law.
"3. You have the right to talk to a lawyer and have him present with you while you are being questioned.
"4. If you cannot afford to hire a lawyer, one will be appointed to represent you before any questioning, if you wish one.
"WAIVER
"1. Do you understand each of these rights I have explained to you?
yes [answered]
"2. Having these rights in mind, do you wish to talk to us now?
yes [answered]
[s] Michael A Dillon
Signature

"Witness to signature:
10:35 PM. [s] Clarence Yingst
3–29–67 [s] Tim Qualls
3:07 PM. 3:40 PM.
3–30–67 3–31–67"
11:30 AM.
3–31–67

State's exhibit RR. *Compare* with quotation, *supra* note 1.

———◆———

16. 91 Idaho 42, 46, 415 P.2d 685, 689 (1966) ; *accord*, People v. Johnson, 70 Cal.2d 541, 75 Cal.Rptr. 401, 412, 450 P. 2d 865, 876 (1969) ; State v. Gammons, 76 N.M. 85, 412 P.2d 256, 258 (1966).

sible was supported by substantial evidence and must be upheld.[17]

Our decision is buttressed by the opinion of the Supreme Court of California in a leading case, People v. Lara.[18] In a well reasoned opinion that Court held that the confessions of two defendants who were members of a minority group, who had little education, whose mental and physical conditions were poor due to a lack of sleep and excessive drinking, and one of whom had a mental age of ten years old and an I.Q. at least ten points lower than the lowest estimate of appellant's I.Q. were properly admitted on a record very similar to the one before use.

■ Appellant further argues that he could not have waived his rights as a matter of law, because he was a minor and, when first asked to waive his rights, he was not accompanied by a parent, an attorney, or another responsible adult. This contention is not supportable. The question is whether there was a knowing or understanding waiver of rights. The determination of this issue turns on whether the police warning was adequate and whether the accused properly understood that warning. If a young adult suspect is determined to have understood, it does not matter whether he was aided in that understanding by an adult or arrived at it on his own determination.[19] The trial court did not err in admitting Dillon's inculpating statements.

■ In his twentieth assignment of error appellant urges that the trial court erred in instructing the jury that the question of voluntariness and admissibility of Dillon's statements was one of law for the court, but that it was the jury's province to determine the truth of the statements and the weight to be accorded them. It is appellant's position that the jury should have been instructed that they could consider first whether the statements were voluntarily made and, if they were found not to be voluntary they should be ignored. The jury would then be instructed that, if they found the statements to be voluntary and, therefore, admissible, they could then determine whether the statements were true and what weight they should accord them. The course followed by the trial judge is similar to that described by the so-called "orthodox" or "Wigmore" rule.[20] That urged by the appellant is ordinarily described as the "Massachusetts" or "humane" rule.[21]

An instruction desired by the appellant was approved in State v. VanVlack.[22] The question before the Court in that case did not involve whether or not the jury should be instructed to review the issue of voluntariness for the purpose of ignoring a "confession" once the trial court had determined it to be voluntary and admissible. The Court in *VanVlack* was concerned with a challenge to the propriety of the admission of VanVlack's confession to any

---

17. Although the trial court made no explicit findings of fact on the quality of appellant's waiver, the decision to allow the statements into evidence implies that the waiver was found to be sufficient. In re M., 70 Cal.2d 444, 75 Cal.Rptr. 1, 13, 450 P.2d 296, 308 (1969) ; *see* Jackson v. Denno, *supra*, 378 U.S. note 4 at 378–379 n. 8, 84 S.Ct. 1774.

18. 67 Cal.2d 365, 62 Cal.Rptr. 586, 432 P.2d 202 (1967).

19. *Id.*, 62 Cal.Rptr., at 599–600, 432 P.2d, at 215–216; *accord*, People v. Aikens, 70 Cal.2d 369, 74 Cal.Rptr. 882, 889, 450 P. 2d 258, 265 (1969) ; People v. Johnson, 70 Cal.2d 469, 74 Cal.Rptr. 889, 895, 450 P.2d 265, 271 (1969) ; *see* State v.

Ortega, 77 N.M. 7, 419 P.2d 219, 224 (1966).

20. 1 J. H. Wigmore, Evidence § 861, at 345–49 (3d ed. 1940). In the appendices to his separate opinion in Jackson v. Denno, *supra*, 378 U.S. note 3 at 411, 84 S.Ct. 1774, Justice Black cites twenty states and three federal circuits as following the Wigmore approach.

21. *E. g.*, Commonwealth v. Sheppard, 313 Mass. 590, 603–604, 48 N.E.2d 630, 639 (1943). Justice Black scored fourteen states and two circuits for this rule. He included Idaho in this category.

22. 57 Idaho 316, 342–343, 65 P.2d 736 (1937).

consideration by the jury at all. The holding in *VanVlack* was simply that it was primarily for the trial court to determine whether a confession was admissible, and that the trial court's decision to admit the confession was erroneous as a matter of law.

In State v. Hall, this Court stated:

"The admission of a confession, when its admission is objected to upon the ground that it was not given voluntarily is primarily for the determination of the trial court. * * * Whether a confession is admissible as being voluntarily given is a question directed primarily to the discretion of the trial court, * * *. The function of the court is to determine the admissibility of evidence presented, and the function of the jury is to determine the weight to be given the evidence and the credibility of the witnesses." (Citations omitted) [23]

The question in that case again concerned whether the "confession" in question was properly admitted into evidence at all. Although the court pointed out that the jury in that case was instructed to disregard the "confession" if they thought it to not have been voluntary and that evidence may be offered for the jury's consideration in determining whether it was voluntary,[24] these statements were only dicta. The latter of the two assertions was in fact made in support of the admissibility of evidence which the court then held was properly refused admission.

A third case which appears to have touched on this issue is State v. Fisk. There this Court said:

"Properly the trial court should initially determine that the confession or admission was voluntarily made as a basis for its admission in evidence. Thereafter, the jury may hear and consider evidence on the voluntariness of a statement *for whatever effect such evidence might have upon the weight to be given the confession or admission.*" (Emphasis supplied) [25]

This statement implies that the jury should be instructed that they may consider the issue of voluntariness of a confession only as it is relevant to their determination of the truth or falsity of the statement, and the weight to be accorded it. This, with some of the language in *Hall* suggests that the "orthodox" approach is preferred. Once again, however, the issue in Fisk was not the direction given the jury, but the admission of evidence touching the voluntariness of the confession, and, therefore, Fisk does not represent a holding on the question before us in this case.

The other two Idaho cases frequently cited on this and related points [26] stand only for the proposition that it is for the trial judge initially or primarily to determine the voluntariness and admissibility of a confession. We are for the first time, therefore, directly presented with the question of whether we should approve the "Massachusetts" rule, whereby first the trial court determines voluntariness and admissibility and, if the confession is admitted, the jury is then allowed to make the same determination, or the "orthodox" or "Wigmore" rule which was followed in this case. Neither course is required as a matter of constitutional due process under Jackson v. Denno.[27]

We today hold that the trial court in the absence of the jury resolves the issue of voluntariness and then determines the admissibility of a criminal defendant's state-

---

23. 88 Idaho 117, 125, 397 P.2d 261, 265 (1964).

24. *Id.*, 88 Idaho, at 125, 126, 397 P.2d 261.

25. 92 Idaho 675, 680, 448 P.2d 768, 773 (1968).

26. State v. Dowell, 47 Idaho 457, 464, 276 P. 39, 41 (1929) ; State v. Andreason, 44 Idaho 396, 401–402, 257 P. 370, 371

(1927). These two cases are noted in Justice Black's appendix A to his separate opinion in Jackson v. Denno, 378 U.S. at 418, 84 S.Ct. 1774, as appearing to suggest the "orthodox" rule while *VanVlack* supports the "Massachusetts" rule.

27. 378 U.S. 368, at 378 n. 8, 391 n. 19, 84 S.Ct. 1774 (1964).

ments. The trial court must find them to have been shown to be admissible by a preponderance of the evidence.[28] If they are admitted, evidence may be offered at trial with respect to the circumstances surrounding the statements, including the manner in which they were obtained, and the jury shall be instructed that they may give such weight and credence to the statements, in view of all of the circumstances, as they see fit.[29] This procedure substantially accords with the normal distribution of functions between judge and jury.[30]

We do not approve that portion of the instruction by the trial judge which indicated that he had already determined the issue of the voluntariness of the defendant's statements. That language might tend to restrict the consideration by the jury of evidence and argument of counsel on the issue of the credibility of those statements, and, therefore, should be avoided. However instruction 35 advised the jury fully that they were to consider the weight and credibility of such evidence.[31]

III.

Appellant, in his seventh assignment of error, contends that the evidence consisting of the items burglarized from Mrs. Simerly and found by appellant's family should have been suppressed. Appellant first contends that the order to

produce this evidence should have been denied because it was, in effect, an order to appellant through his attorney to incriminate himself. The privilege against self incrimination refers only to communicative and not "real" evidence.[32] The same is true of the attorney-client privilege.[33] An attorney may not act as a depository for criminal evidence, and he may not suppress such evidence.[34] The order of the district court was not erroneous.

Appellant also asserts that the evidence of the burglaries should not have been admitted into evidence, because it was prejudicial as evidence of other, prior crimes. The items in question were found in appellant's suitcase in appellant's bedroom and in the trunk of his car. They were, therefore, reasonably identified with and connected to appellant. Mrs. Simerly's suspicion that Dillon had been burglarizing her home is a thread which runs throughout appellant's statements, and, according to appellant's stepfather, was the reason Dillon ultimately gave for committing the murder. The contents of the suitcase and the .410 shotgun were, therefore, circumstantial evidence, probative of a motive for appellant having killed Alta Simerly, i. c. to silence her from telling her suspicions to the police. As evidence of a motive these items were admissible even though they were also evidence of prior crimes.[35]

28. People v. Sammons, 17 Ill.2d 316, 161 N.E.2d 322, 324 (1959); cf. State v. Crank, 105 Utah 332, 142 P.2d 178, 184–185 (1943).

29. See Washington Rules of Superior Court, Criminal Rule 101.20W(d) (adopted 1958); 1 J. H. Wigmore, supra note 20 at 349.

30. See 1 J. H. Wigmore, supra note 20, at 345.

31. "It is within your province, however, as in the case of any other testimony or evidence introduced at this trial, to determine the weight and credibility to be attached to these statements, or any of them, and whether or not they are true; and if you should find that a statement was false in any particular, it remains,

nevertheless, evidence for your consideration in connection with any other evidence in this case, to be given such significance and weight as your judgment may determine." (Instruction No. 35)

32. State v. Bock, 80 Idaho 296, 301, 328 P. 2d 1065 (1958); see United States v. Wade, 388 U.S. 218, 221–223, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967); Gilbert v. California, 388 U.S. 263, 266–267, 87 S. Ct. 1951, 18 L.Ed.2d 1178 (1967).

33. I.C. § 9–203(2).

34. See State on Relation of Sowers v. Olwell, 64 Wash.2d 828, 394 P.2d 681 (1964).

35. State v. Reding, 52 Idaho 260, 13 P.2d 253 (1932).

## IV.

■ Appellant next argues that the trial court erred in excusing for cause veniremen with scruples against capital punishment. Following Witherspoon v. Illinois,[36] it is error, in a case involving a possible death penalty which is imposed by a jury, to exclude from the jury persons who would hesitate to impose capital punishment. The United States Supreme Court, in that case and in its companion case, Bumper v. North Carolina,[37] specifically held that such an exclusion is harmless error if the verdict actually rendered precludes the imposition of the ultimate punishment.[38] Although it may have been error for the district court to have excluded the veniremen opposed to capital punishment, because the jury returned a verdict of murder on the second degree which at once precluded their recommending the death penalty,[39] such error was harmless.

## V.

■ Appellant next contends that the district court erred in excluding all of the appellant's friends and relatives from the courtroom during the trial. An examination of the record reveals that appellant is referring to an order of the court excluding all *witnesses* from the courtroom. It was appellant who originally requested that the State's witnesses be excluded; the trial court merely made the order evenhanded by applying it to both sides. The exclusion of witnesses from the courtroom during trial rests in the sound discretion of the trial court.[40] In this case the district court acted with fairness and his order was not, therefore, erroneous.

## VI.

■ During the trial several color photographs taken of Alta Simerly's body where it was discovered in the sandpit were admitted into evidence. Appellant contends that these pictures, a few of which vividly portray the bloody and battered condition of the victim's head, were prejudicial in that they only served to inflame the jury's passion. In State v. Martinez we stated that:

"The general rule is that photographs of the victim in a prosecution for homicide, duly verified and shown by extrinsic evidence to be faithful representations of the victim at the time in question are, in the discretion of the trial court, admissible in evidence as an aid to the jury in arriving at a fair understanding of the evidence, proof of the *corpus delicti,* extent of injury, condition and identification of the body, or for their bearing on the question of the degree of atrociousness of the crime, even though such photographs may have the additional effect of tending to excite the emotions of the jury." [41]

In this case these photographs corroborated the testimony of the officers who investigated the discovery of the body, and, because they showed the condition of Mrs. Simerly's head and clothing, they were probative of the truth or falsity of appellant's various accounts of how she was killed. The color photographs were, therefore, properly introduced into evidence.

36. 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed. 2d 776 (1968).

37. 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed. 2d 797 (1968).

38. 391 U.S., at 517–518, 88 S.Ct. 1770 and 391 U.S. 545, 88 S.Ct. 1788.

39. I.C. § 18–4004 provides: " * * * Every person guilty of murder in the second degree is punishable by imprisonment in the state prison not less than ten years and the imprisonment may extend to life."

40. I.C. § 9–1201, applied to criminal actions by I.C. § 19–2110; *see* State v. Oldham, *supra* note 14, 438 P.2d, at 283.

41. 92 Idaho 183, 188, 439 P.2d 691, 696 (1968); *see generally* People v. Bradford, 70 Cal.2d 333, 74 Cal.Rptr. 726, 450 P.2d 46 (1969); People v. Thomas, 65 Cal.2d 698, 56 Cal.Rptr. 305, 423 P.2d 233 (1967) (cert. den. 389 U.S. 868, 88 S.Ct. 140, 19 L.Ed.2d 143). People v. Conley, 64 Cal.2d 310, 49 Cal.Rptr. 815, 411 P.2d 911 (1966); State v. Johnson, 201 Kan. 126, 439 P.2d 86 (1968).

## VII.

During the course of the trial police officers used portions of the Twin Falls police record of the Simerly murder investigation to refresh their memories. Appellant asserts that it was error for the trial court to have denied his motion to place the entire record in evidence. We do not agree with this contention. Appellant had the right on cross examination to inspect such items of the file which had been used by police officers and he could read relevant portions to the jury if he so desired. In this case that right was so afforded appellant.[42] He did not have a right to enter into evidence the vast amount of irrelevant material, much of it written by persons other than the testifying officers and unused by them, which had accrued during the course of the investigation.[43] The trial court did not err, therefore, in denying appellant's motion to have the entire file in evidence at trial.

## VIII.

Appellant next assigns as error the limitations placed on his cross examination of two prosecution witnesses. Appellant's counsel attempted to ask detective Qualls: (A) "During these interrogations did it appear to you that Mike was suggestive?" (B) "Did leading questions of Chief Yingst asked during the early interrogations later appear as facts in Mike's statements?" (C) "From the information you have received and the investigation you have performed, there is nothing completely inconsistent with the story Mike has given you that a third person was there, is there?" The first and third questions called for conclusions or opinions from the witness. Generally a witness should be asked questions calling for the

most concrete and factual description possible, and the trial court may properly exclude questions designed to elicit answers in the form of opinions which intrude on the jury's fact finding competence.[44] The trial court correctly limited appellant's counsel's cross examination to questions not designed to produce non expert opinions. Other questions asked of other prosecution witnesses were properly excluded on the same ground.

The second question propounded to detective Qualls was properly excluded because it was misleading. It assumed the truth of the statement that Chief Yingst had asked leading questions. As such it was properly excluded.[45]

## IX.

Appellant's assignment of error number thirteen concerns the closing statements to the jury made by counsel for the prosecution. Sub-paragraph A of that assignment of error refers to comments made by the prosecutors that they were convinced that the defendant was guilty. Upon examination it appears that this assignment misquotes the meaning of the prosecutors' statements. At the first cited instance of this alleged abuse the prosecutor said "We believe that there should be no doubt in your minds * * * that this defendant * * * is the person responsible for the death of Alta Simerly." Later on the prosecutor did say "I firmly believe" several times, but he was referring not to the question of appellant's guilt, but only to which among the possible weapons was the one which probably killed Mrs. Simerly. The prosecutor finally used the words "firmly convinced," but again he was making no reference to appellant's guilt. Inasmuch as neither prosecutor did in fact

42. I.C. § 9–1204; State v. Johnson, 92 Idaho 533, 537, 447 P.2d 10, 14 (1968).

43. State v. Rodriguez, 93 Idaho 286, 290, 460 P.2d 711, 715 (1969); State v. McMahan, 57 Idaho 240, 250–251, 65 P.2d 156 (1937); State v. Ramirez, 33 Idaho 803, 809–810, 199 P. 376 (1921).

44. Sturgis v. Garrett, 85 Idaho 364, 368, 379 P.2d 658 (1963); see C. McCormick, Law of Evidence § 11 at 22–24 (1954); cf. Bean v. Diamond Alkali Co., 93 Idaho 32, 454 P.2d 69 (1969).

45. E. g., Haithcock v. State, 23 Ala.App. 460, 126 So. 890 (1930); see C. McCormick, supra note 44, § 7, at 12.

say that he was convinced of Dillon's guilt, the alleged impropriety did not occur.

■ Sub-paragraph B under assignment number thirteen alleges that the prosecutor referred continually in the closing argument to the appellant's "testimony" when the appellant had not testified at all at trial, but had only made the station-house statement. This is also an inaccurate rendition of what the prosecutor did. In the first instance cited by the appellant, the word "testified" is used in a general sense, and had no reference to the sense of "testify" or "testimony" in a court of law. At the second instance the "testimony" referred to appears to be that of the officers who testified concerning appellant's statements and conduct. At another point the reference to "testimony" refers not to the defendant, but to Dr. Moench. On the only occasion when the term "testified" was used with respect to statements made by appellant, the prosecutor immediately caught himself and withdrew the word, supplanting it with one that was more accurate. Once again the alleged impropriety did not occur.

■ Sub-paragraph C under assignment thirteen alleges that the prosecutor attacked appellant's relatives "before the jury giving impression that they were guilty of serious impropriety." What happened, however, was quite different. Ivy Green, appellant's aunt, testified concerning statements which appellant made on the Sunday after his confession to the effect that he did not remember committing the murder but that he must have because they (the police) said that he did. Ivy Green, in contravention of the exclusion rule requested by appellant's counsel, had been in the courtroom during an officer's testimony which differed from her own. The prosecution objected to this, and they referred to it in their closing statement. Ivy Green's testimony stayed in, for whatever weight it was worth. The prosecutor's reference to the fact that Ivy Green had stayed in the courtroom and, therefore, had had the opportunity to adjust her testimony to that which had gone before her was hardly an attack giving an "impression" that she was "guilty of serious impropriety."

## X.

■ Appellant's assignments of error fifteen, sixteen, seventeen, and nineteen concern the trial court's instructions with respect to the law of homicide.

His primary contention is that the expressions "malice" and "malice aforethought" are misdefined and misused in the district court's instructions. Appellant's first objection concerns the trial court's definition of malice in terms of I.C. § 18–101(4):

> "The words 'malice,' and 'maliciously,' import a wish to vex, annoy, or injure another person, or an intent to do a wrongful act, established either by proof or presumption of law."

This definition under the statute is not applicable in a murder case. The concept of "malice" as that term is used in I.C., Title 18, Chapter 40, Homicide, imports something more than a "wish to vex, annoy, or injure another person * * *." [46] If, however, the jury is fully instructed concerning the frame of mind required by I.C. § 18–4002, "Express and Implied Malice," [47] any error of the I.C. § 18–101

---

46. People v. Conley, *supra* note 41, 49 Cal.Rptr., at 821–822, 411 P.2d, at 917–918; People v. Gorshen, 51 Cal.2d 716, 731, 336 P.2d 492, 501 (1959); People v. Chavez, 37 Cal.2d 656, 666, 234 P.2d 632, 638–639 (1951); People v. Waysman, 1 Cal.App. 246, 248, 81 P. 1087, 1087–1088 (1905).

47. "Such malice may be express or implied. It is express where there is manifested a deliberate intention unlawfully to take away the life of a fellow creature. It is implied when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart." I.C. § 18–4002.

instruction is rendered harmless.[48] The jury was so instructed in this case,[49] and, therefore, no prejudice was suffered by appellant on account of the erroneous instruction.

 The district court's instruction number six defined "malice aforethought" as "malice and premeditation." This instruction should not have been given, because "premeditation" is the word used to denote a mental element which distinguishes murder in the first degree from murder in the second degree, and, therefore, ran the risk of confusing the jury. It was not, however, harmful error. Following the case of State v. Dong Sing,[50] such an instruction, if given only to describe to the jury the elements of first degree murder, and not given in an attempt to differentiate between the two degrees of murder, is not cause for a reversal if the jury was adequately instructed elsewhere concerning the distinction between the two degrees of murder. The jury in this case was properly instructed on the different degrees of murder and other types of homicide and the distinctions between them.

 Appellant next contends that the trial court erred in giving instructions concerning murder which used the term "malice" and not "malice aforethought." An examination of the instructions complained of indicates that they are derived from I.C. §§ 18–4002, 18–4006. Both of these sections use the word "malice" to refer to "malice aforethought" as that expression is used in I.C. § 18–4001. The word "malice" is used for the same purpose and in the same manner in the challenged instructions. This was not error.

" 'Ordinarily the language employed by the Legislature in defining a crime is deemed to be best suited for that purpose, an error cannot be predicated upon its use in informations and instructions.' "[51]

 Appellant also argues that the trial court's instruction number twenty was in error, because it stated:

" 'In case of homicide committed by the use of a deadly weapon, the law presumes malice and casts upon the person responsible for the homicide the burden of repelling the presumption of malice, unless there is other evidence in the case which shows that the killing was done without malice.' "

A similar instruction was approved in State v. Owen [52] and was not error.

 Appellant in his assignment of error number nineteen asserts that the trial court failed to instruct the jury properly concerning the degrees of murder. Appellant's principal contention in this regard stems from the use of the phrase "an intent to kill" in a statement concerning second degree murder in the district court's twenty-third instruction. Appellant argues that an intention to kill is also an element of voluntary manslaughter, and, therefore, that the jury could have found him guilty of murder even if they had only found facts sufficient to support a verdict of guilty of manslaughter. This is not true. The jury was repeatedly instructed that malice aforethought was a necessary element of both degrees of murder, and instruction twenty-nine clearly sets out the law of manslaughter and its distinction from murder. The jury was correctly in-

48. People v. Dice, 120 Cal. 189, 52 P. 477, 482–483 (1898) followed and modified by cases cited *supra* note 46.

49. "Malice may be express or implied. It is express when there is manifested a deliberate intention unlawfully to take away the life of a fellow creature. It is implied when no considerable provocation appears, or when the circumstances attending the killing show, an abandoned and malignant heart."

50. 35 Idaho 616, 623–624, 208 P. 860 (1922).

51. State v. Brooks, 49 Idaho 404, 409, 288 P. 894, 897 (1930), cited in State v. Anstine, 91 Idaho 169, 172, 418 P.2d 210, 213 (1966).

52. 73 Idaho 394, 417, 253 P.2d 203 (1953).

structed to consider the instructions as a whole,[53] and, taken as a whole, the instructions correctly stated the law. There was, therefore, no error in the statement of the degrees of murder and the distinction between murder and manslaughter.[54]

## XI.

Appellant's eighteenth and twenty-second assignments of error raise the issue of the effect of Dillon's "mental age" on his ability to commit the crime of which he was convicted. Appellant's first contention is that under I.C. § 18–201(1), he should not have been convicted of having committed a crime if the jury had believed that his "mental age" was under fourteen. I.C. § 18–201(1) provides as follows:

"*Persons capable of committing crimes.* —All persons are capable of committing crimes, except * * *

(1) Children under the age of fourteen (14) years, in the absence of clear proof that at the time committing the act charged against them, they knew its wrongfulness."

The concept of a "mental age" is unrelated to chronological age. According to appellant's own witness, it is a reference term used to describe the learning capacity or ability of a given person.[55] All evidence offered by both sides concerning Dillon's mental makeup, including that using the shorthand notation of "mental age," indicated that appellant, while slightly dull, was a normal youth of the chronological age of seventeen. Because "mental age" is an arbitrary shorthand term, and a mental age of thirteen is conceded to be within the normal intelligence range of persons in appellant's chronological age group, and because mental incapacity for persons over the age of fourteen is treated elsewhere in the statute[56] we hold that "mental age" is not to be considered as equivalent to "age" as that word is used in I.C. § 18–201(1) and that the jury was properly instructed when the trial court quoted I.C. § 18–201 in instruction number nine.

Appellant also urges that we consider adopting a rule of "diminished responsibility."[57] In our recent decision, State v. White,[58] we specifically declined to adopt such a rule. We reaffirm that decision today.

## XII.

Appellant, by his twenty-first assignment of error, has raised the question of whether the district court's instruction concerning the law of principals was correct. That instruction stated that Dillon would be a principal (although the word principal was not used, the legal effect of his having been principal was accurately explained) in the murder if he was present at and participated in the assault on Mrs. Simerly. This was a correct statement of the law; an accused is a principal if he is present during an illegal act and participates in it.[59] In his early statements made

53. See e. g., State v. Tope, 86 Idaho 462, 469, 387 P.2d 888 (1963); State v. McCallum, 77 Idaho 489, 497, 295 P.2d 259, 263 (1956) ("Parts of instructions cannot be taken out of context and used to get a meaning not properly therein."); State v. Hargraves, 62 Idaho 8, 22, 107 P.2d 854 (1940).

54. The first paragraph of instruction twenty-seven as it is set out in the printed transcript apparently contains a typographical error. The second paragraph of that instruction accurately restates the law. The instruction was, therefore, adequate. *See* State v. McCallum, *supra,* note 53.

55. People v. Lara, *supra* note 18.

56. I.C. § 18–201. "*Persons capable of committing crimes.*—All persons are capable of committing crimes, except those belonging to the following classes: * * 2. Idiots. . 3. Lunatics and insane persons. * *"

57. *See e. g.*, People v. Conley, *supra* note 41.

58. 93 Idaho 153, 159, 456 P.2d 797, 803 (1969).

59. I.C. § 18–204; *see* State v. Kleier, 69 Idaho 278, 283, 206 P.2d 513 (1949).

to the police, appellant had asserted that he had been coerced into aiding the real murderer in disposing of the victim's remains. Such coercion might have relieved Dillon of criminal responsibility for murder in the second degree under I.C. § 18–201(8) [60] and the jury was so instructed in instruction nine. The district court's instruction thirty-eight on the question of Dillon's criminal liability if another person took part in the crime, when read with instruction nine, is a correct statement of the law.

The remainder of appellant's assignments of error are merely *pro forma* statements that the jury's verdict and the district court's judgment were not supported by the law or evidence. We have treated each of the substantive questions raised by appellant's particular assignments of error, and we have concluded that the jury's verdict was supported by substantial evidence and that there was no reversible error of law in the proceedings below.

The judgment of conviction is affirmed.

McFADDEN, C. J., DONALDSON and SPEAR, JJ., and THOMAS, District Judge, concur.

60. I.C. § 18–201 *"Persons capable of committing crimes.*—All persons are capable of committing crimes, except those belonging to the following classes: * * * 8. Persons (unless the crime be punishable with death) who committed the act or made the omission charged, under threats or menaces · sufficient to show that they had reasonable cause to and did believe their lives would be endangered if they refused." (Now I.C. § 18–201, subd. 7).